ADDIE F. BABBITT *vs.* SAFETY FUND NATIONAL BANK.

Worcester.   October 8, 1897. — October 22, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & MORTON, JJ.

*Artificial Watercourse — Obstructing Flow — Negligence — Action.*

A. owned land adjacent to an artificial watercourse, and B. owned land through which the water flowed after passing A.'s land. B., who was under a contract with C., from whose mill the water flowed through the watercourse over B.'s land, not to make any erection thereon which would interfere with the flow of the water, constructed a grating across the watercourse on his land, and rubbish put into the water negligently or wrongfully by third persons accumulated on the grating, obstructing the flow, and setting the water back upon A.'s land, to his damage. *Held,* that A. could maintain an action therefor against B.

TORT, for erecting and maintaining a barrier in a certain channel, whereby the water was caused to flow upon the plaintiff's premises. Trial in the Superior Court, before *Hardy,* J., who allowed a bill of exceptions, in substance as follows.

The plaintiff put in evidence a deed of her premises from one Nixon, dated May 1, 1890, and duly recorded. The premises were situated on the southerly side of Main Street, at the corner of Putnam Street, and on the easterly side of Putnam Street, in Fitchburg.

The defendant was the owner of a block situated on Main Street easterly of the plaintiff's premises, the land of one Cutler however intervening between the plaintiff's land and that of the defendant. The channel in question extended from the wheel pit of the Putnam Machine Company, a point some distance westerly of Putnam Street, through land of the Putnam Machine Company to Putnam Street and under that street by a culvert, and then along the southerly side of the plaintiff's premises, past the Cutler premises, across the lot of the defendant underneath the block of buildings erected by him, through a stone cemented channel, which there was evidence tending to show that the defendant had constructed.

Next southerly of the plaintiff's premises and extending easterly to the defendant's premises was a lot, formerly of one Joseph Cushing, extending westerly to Putnam Street. Four or five

years before the action was brought, Cushing had built on the northerly side of the channel a wall, which was all or nearly all on Cushing's land. There was evidence tending to show that before the wall was built the channel flowed next to the plaintiff's land.

Charles A. Babbitt, called as a witness by the plaintiff, testified that the plaintiff's block was on Main and Putnam Streets, and extended back to Putnam's raceway, so called; that there was a large wall that separated the plaintiff's premises from the raceway as it now runs; that that wall was built about five years ago; that it extended from Putnam Street to the end of the plaintiff's estate and by it; that before that wall was built the raceway ran right along, washing the shores of the plaintiff's estate until it passed it; that there was a grate on the defendant's land " that went down," and a large timber was put across the whole of the stream, and the bottom of the grate rested on the timber; that the grating leaned up against the wall of the defendant's building; that there were fifty bars in the grating; that when the plaintiff bought the premises the raceway, after it passed her premises, spread out and was wider after it got on to one Crocker's land, Crocker being the grantor of the defendant; that a year or two before Crocker sold to the defendant he put in a wall on each side of the raceway, so that it confined it between two walls; that the defendant took those walls out and put in new ones; that they were very nearly in the same place as the new walls which the defendant put in; that the channel was narrower as the defendant constructed it than as Crocker left it; that the log on which the bottom of the grate rested was imbedded in the bed of the channel; that the top of the log was flush with the bottom of the channel outside of the grating; that the bars in the grating were about a quarter of an inch wide and about an inch thick, and about an inch and a half apart; that the grating covered the whole entrance to the opening under the defendant's block; that the surface water from Putnam Street went into the raceway; that there was an iron grate in Putnam Street through which the surface water from that street would run into the raceway; that before the erection of the grating at the defendant's block, which was in 1894, there never was any trouble with the raceway or canal; that

boards, paper, chips, and all sorts of stuff, came down and lodged on these bars, and the result was that the refuse, striking against the bars and the boards and whatever there was, would make a dam there and not let water flow through it, but raise the water, which set back and flowed into the cellar of the " old house," so called, on the plaintiff's premises ; that that happened very frequently before the time alleged in the declaration, and it was cleaned off by the defendant and the witness; that the defendant, whenever notified, would go there and rake off the grating, and just as soon as the grating was raked off the water would come through and become lower ; that the defendant took charge of the grating ; that he had seen the defendant's officers at the grating many times; that he had requested the defendant's president and cashier to clean off the grating, and they had done it ; that he had cleaned it off himself more than one hundred times ; that he had seen the plaintiff's tenants cleaning it off ; that there was a general undertaking to keep it clean ; that on March 21, 1895, the date alleged in the declaration, between eleven and twelve o'clock in the forenoon, the witness was notified that there was trouble with the grating ; that he went there and found that the water was up to the top of the grate, and that it was flowing back and had gone into all the plaintiff's cellars ; that the grating was not totally obstructed, but at the top the obstruction was so large it could not get through the grate, and the witness took hold and pulled off some boards and a lot of stuff, and the water lowered considerably ; that he had a rake which finally caught down low, and he pulled the rake out, and a big canvas that had followed and lodged up against the grating came out; that he would not undertake to say how large the canvas was, but it was large enough to cover the whole grate ; that the canvas came from the defendant's building, which was in process of erection at this time ; that the canvas was used for the purpose of covering the brick, as the witness supposed ; and that, after the canvas was pulled up, the water lowered instantly.

On cross-examination, the witness testified that there was rubbish of various kinds on the grating ; that he did not know who put it there or where it came from ; that he could not tell whether the plaintiff's tenants put it there or not, but they might have

done so; that after the injury complained of the city had cleaned out the channel between Putnam Street and the defendant's building; and that he saw them take out a great many cartloads of stuff, but did not know how much.

The plaintiff called John W. Hart, who was a tenant of one of her buildings, and occupied one of the cellars that was overflowed by the water setting back on March 21. He testified that before the grating was put in the cellar was all right; that after this grating was erected the water came into his cellar, and when the water came in he found rubbish collected on the grating; that he had seen paper, boards, and rubbish lodge there, but he did not know where the rubbish came from; that on March 21, about ten o'clock, his attention was called to the cellar, and the water in it was quite high, — two or three feet; that he went to the defendant bank and notified the president, and he sent a man there; that the grate was covered with water, and it ran against the building; that the water was much higher than its normal height; that they cleaned the grating off, raking off chips, paper, and stuff that had collected there; that he saw them pull off a large canvas which covered the grating; that he saw the canvas about the building before that time; that he had seen them use the canvas at various places on the building; that the water went down immediately after the canvas was removed, and was all out of his cellar in half an hour; that the grating rested on a timber twelve inches square in the bottom of the trench; that he thought the timber was above the bed of the stream; that he thought it was stuck in the bed of the stream very little; and that on that day he saw no other obstruction in the canal than the grating and the things collected on it.

The plaintiff called several other witnesses, who corroborated the testimony of Babbitt and Hart as to the accumulation of rubbish on the grating and the flowing back of the water upon the plaintiff's premises, the removal of the rubbish, and the immediate subsidence of the water.

The defendant put in evidence a deed from the Putnam Machine Company to Joseph Cushing, which conveyed the land next southerly of the plaintiff's premises and of the Cutler lot, and extending from Putnam Street easterly to the land and block

of the defendant, and some distance south of the premises in question.   This deed was dated August 16, 1884, and was duly recorded, and contained the following stipulations:

"Together with all rights, interests, and privileges, if any, which it may have in respect to the racecourse which passes through said land; excepting, however, and expressly reserving the right to use and enjoy a racecourse across said land and to flow water through the same in an aqueduct or channel of the same dimensions as, and in continuation of, the aqueduct now used by it under said Putnam Street; and this deed is upon the express condition that no building or other erection shall be put upon said land so as to interfere with the said right, or with the flow of water aforesaid."

The defendant also put in evidence a deed from Charles T. Crocker to the defendant, dated February 5, 1894, and duly recorded.   This deed conveyed a parcel of land bounding northerly on Main Street, easterly on land of one Brigham, southerly on land of Joseph Cushing, and westerly on land formerly of the Putnam Machine Company, now of Cushing, "subject to the right of the Putnam Machine Company to maintain their racecourse across said land and to flow water through the same; and this deed is upon the condition that no building or other erection shall be put upon said land so as to interfere with the said right, or with the flow of water aforesaid."

The defendant called as a witness George Raymond, a civil engineer, who testified that he had lived in Fitchburg forty years, and was city engineer in the years of 1873 and 1874; that there was a sewer put in by the city a few years before, extending from Main Street through Putnam Street to this channel, and emptying into the channel in the Putnam Street culvert; that the grating in question was composed of fifty bars, which were one quarter of an inch thick and one inch wide, and one and a half inches apart; that the bars were so placed that the thin dimension was in the direction of the flow of water; that the bars were five feet in length, and ran up and down; that when the gates at the Putnam Mill wheel were shut the water fell sixteen inches; that on June 16, 1897, he put the grate in, it having been taken out before that time, and that when the mill was running it raised the water one quarter of an inch in the stream; that in

June, 1896, he made a survey and profile of the channel, and found it filled with various rubbish and mud above Putnam Street on the west, in the Putnam Street culvert, and below the Putnam Street culvert to and into the channel under the defendant's building; and that since June, 1896, the city had taken out a large quantity of that rubbish and material.

On cross-examination, he testified that before the pond was filled there was no defined bed for the channel below Putnam Street; that before the defendant's building was put up, Crocker, the former owner, had enclosed the channel across the lot with two walls, leaving it open at the top ; that the north bank along the plaintiff's land was indicated by a low cobble wall, which was buried under rubbish ; and that in June, 1897, when he made the measurements referred to, the bed of the channel had been materially deepened and widened by the removal of the rubbish.

The defendant called as a witness Edgar S. Moulton, who testified that he built the defendant's building above the foundation, by a contract furnishing the labor and material therefor, and took possession thereof for that purpose in September, 1894, and retained possession until July, 1895; that Crocker put walls in, in 1893, of granite stone; that above the walls the channel was full of rubbish of all kinds; that he himself put the wall on the northerly side of the channel along the Cutler land and the plaintiff's land for Cushing, in 1891; and that he built a solid wall there.

On cross-examination, he testified that he had nothing to do with the foundation of the defendant's building, but he took it after the foundation was built; and that the channel constructed by the defendant over its lot was in the foundation of the building.

The defendant called David A. Hartwell, city engineer of Fitchburg, who testified that the overflow sewer extended from Main Street through Putnam Street and emptied into this channel under Putnam Street; that this was an extension of a sewer through Oliver Street, entering Main Street on the north side of Putnam Street; that this was intended for an overflow sewer, and there was a catch-basin at Main Street with a ten-inch pipe designed to carry the sewage coming down Main Street and Oliver Street from points west and north of the junction of Putnam

and Main Streets into the Main Street sewer which runs easterly from Putnam Street; and that when this ten-inch pipe was clogged up, as he had seen it clogged up, the sewage would flow over down Putnam Street into the channel in question.

It was agreed that the wheel in use at the Putnam privilege on March 21, 1895, was a wheel that discharged practically the same amount of water as the wheel in use at the time of the deeds from the Putnam Machine Company to Cushing, and from Crocker to the defendant.

Charles A. Babbitt was recalled, and, in rebuttal, testified that the grating was in place when Moulton began to build; and that he knew the man who had charge of the foundation put in the grating.

The plaintiff also put in evidence in regard to the effect of the water on March 21, 1895, upon her premises.

The defendant asked the judge to rule as follows:

" 1. On the evidence in this case the only obligation the defendant was under, with respect to the canal or channel referred to in the plaintiff's declaration, was to allow the Putnam Machine Company to maintain it as a racecourse across the land, and to flow water through the same; and if the defendant provided a sufficient aperture and channel to carry off the water which ordinarily flowed from the wheel and tail-race of the Putnam Machine Company's mill, it would not be liable for any flooding of the plaintiff's premises by water coming from any other source.

" 2. If the defendant's channel under its building was of sufficient dimensions, at the time complained of, to carry off the water then flowing from the Putnam wheel through the racecourse, the defendant is not liable to the plaintiff by reason of any flooding caused by water coming from any other source, whether from sewers of the city of Fitchburg or from surface water flowing in the streets or on the surface of the ground and discharged into said channel.

" 3. If the dimensions of the channel provided by the defendant were sufficient to carry the water from the mill of the Putnam Machine Company, as it existed in 1884, the defendant is not liable for any obstruction of the stream caused by the discharge into it, above the plaintiff's premises, of sewage or surface water from the sewers of the city or from the streets of the city, or by

rubbish thrown or carried into the stream by third persons or by causes over which the defendant had no control; and in order to recover, the plaintiff must show that the defendant, by the obstruction alleged, contributed appreciably to the plaintiff's damage.

"4. If the plaintiff suffered any damage by the flooding of her premises, it is necessary for her to show, in order to recover damages in this case of the defendant, precisely what part of her damages was caused by the negligent and unlawful act of the defendant, and if the facts do not disclose what part of the whole damage was caused by the defendant's negligent act, there can be no recovery in this case.

"5. The defendant was in no way bound to provide for the discharge of water thrown or carried into said channel by the sewers of the city, or by the channels on the surface of the streets, nor for water discharged from the premises other than the Putnam Machine Company's mill; and if water was discharged from said sewers or from streets or other premises, or if obstructions in the nature of rubbish thrown into said stream actually caused the water to set back upon the plaintiff's premises in any appreciable degree, the plaintiff cannot recover in this case unless she shows what portion of the flooding was caused by the negligent acts of the defendant.

"6. There is no evidence that the screen or grating in and of itself caused the water to set back on the plaintiff's premises, but only that rubbish of various kinds accumulated against the screen or grating caused it; and there is no obligation of the defendant shown to keep the stream clear, or to provide for the passage of rubbish thrown or carried into the stream without its fault, and therefore the plaintiff cannot recover.

"7. If the defendant would be liable for any negligent failure to remove obstructions placed by third persons upon the grating or screen, there is in this case no evidence of any neglect on the part of the defendant to remove the obstructions, which, on the evidence, caused the water to rise and overflow the plaintiff's premises."

The judge declined to give the rulings requested, and instructed the jury, among other things, as follows:

"It is for you to find whether this was a watercourse, and I

instruct you, as a matter of law, that, so far as the facts are concerned in this case, her [the plaintiff's] rights would be the same under an artificial watercourse as under a natural watercourse; that she would be entitled to be protected from any obstruction of this artificial watercourse by the wrongful act, or negligent act, of the proprietors of land below.

" Now, the next question that arises in this case is, What has the defendant done with reference to the use of this artificial watercourse? Has the defendant erected a barrier, or anything that could be called a barrier, to obstruct the flow of this stream? Has the defendant, in connection with the keeping of an aperture open for the passage of water, done anything which would have a tendency to obstruct the natural flow of the stream, and has the defendant maintained that structure? Was this grating erected or maintained by the defendant previous to March 21, 1895? The court, as you heard, was called upon to say there was no evidence for you to consider upon that point. That is a question of fact. It is not a question before you simply whether or not the defendant has erected this grating or screen, but also you are to consider, if you do not find that the defendant by its actual officers or agents erected it, whether or not the defendant has maintained that screen. If you should find it maintained it, even though it had not erected it, on that issue it would be your duty to find for the plaintiff. . . .

" If you are satisfied, upon all this evidence, that there is no evidence which did connect the defendant with the maintenance or erection of the dam, then it will be your duty upon that issue to find for the defendant. . . .

" The next proposition is, if you find that the defendant did erect or maintain this structure, whether the defendant did anything that was wrong in its nature, and whether by the act of the erection of the screen, together with the acts of any other parties, or by reason of the fact that rubbish collected here, the defendant is liable. And that is one of the very important things in this case, and depends mostly upon questions of law. . . .

" Now, if you find that the defendant was the owner of this building, (and there seems to be no doubt upon that point,) or if you find that the defendant was maintaining this screen, it is

for you to say, under the instructions of the court, whether or not the defendant caused damage to the plaintiff by such maintenance.

" You have evidence here tending to show that the defendant undertook certain obligations with reference to the Putnam Machine Works. That obligation is an obligation created by contract. If you find that the plaintiff was the owner, upon the bank of the stream above, the defendant not only undertook an obligation by contract with the Putnam Machine Works, but it was its duty to see to and manage its property so as not to affect or injure the rights of others upon the same stream above. It had no right, by reason of the fact that it was under certain contract obligations with the Putnam Machine Works, to so manage this opening as to cause the artificial stream . . . to overflow to the injury of the plaintiff. . . .

" Now the first question is, Was the method of maintaining this opening by the screen a proper method? Was this grate a proper aperture or opening, under the circumstances? It is argued by the defendant, that it had the right to protect its own land from the various substances being carried under that building. That is true. It had the right to do that, but it did also undertake to become liable to anything that might occur if it attempted to carry out that right. If it chooses to put that screen there for the purpose of protecting itself from dead animals that might float down the stream, it has no right, under the circumstances, to do it in such a way as may cause an overflow of the water to the damage of the proprietors above. It has to take the expense of settling all liabilities for damage that may arise. . . .

" If you find on that evidence that the defendant did have some knowledge and some reason to believe that such obstructions would occur, that is proper evidence for you to consider on the question whether or not this was a proper method, if the defendant was under the duty to protect the rights of others upon the same stream.

" Now, your attention has been called here to the liability of the defendant, by reason of the fact that other parties may have put obstructions into that stream. It would be possible for you to find, and very probable that you would find, on this evidence,

that the act of erecting the screen alone would cause no damage to this plaintiff. It may also be probable and possible for you to find, if there were no screen there, that these foreign substances, or rubbish, would have floated down and would have caused no damage to the plaintiff.

" It is a question for you to find, whether or not, by the combination of circumstances, that is, by the location of the screen across this stream, and by the lodging of rubbish against it, whether that combination has caused injury to the plaintiff. Those are the main questions in the case, whether or not this defendant is liable by reason of the fact that some other parties have combined with it, and by the result of that combination, not by any accident or arranged plan beforehand, but by the result of certain facts, that is, the effect of the screen and the result of the fact that certain articles went into the stream that caused this obstruction, the defendant would be liable. . . .

" If the injury was caused to the plaintiff by the erection of this barrier, taken in connection with the act of a third party, the acts of the defendant and the third party acting in their effect together, then, although no injury would have happened by the acts of either alone, the defendant would be liable. The defendant has no right so to maintain this opening, or permit it to be so continued, as to flood the land of the plaintiff, but is bound to keep open sufficient outlet for such waters. If, after the defendant had made this culvert, with the necessary outlet for waters sufficient, other parties with the knowledge of the corporation officers did close such outlet, and damage was thereby occasioned to the plaintiff which she would not have suffered but for the existence of the grate as allowed to be maintained by the defendant, then the defendant would be liable. . . .

" Then, an important question for you to consider is, if you find that this obstruction was caused by the rubbish that collected against this grate, whether or not the defendant used due diligence to remove the same. . . . If you find that the defendant or its officers have used the diligence of a man of ordinary and average prudence under the circumstances, it would be your duty to find for the defendant. But if the defendant has not used that diligence, or has not used that care which men of

ordinary prudence would use under the circumstances, then it would be your duty, if you found for the plaintiff on the other issues in the case, to find for the plaintiff.

"A question has arisen in this case, if you find for the plaintiff on the other issues, as to the question of damage. Upon that point your attention has been called to the condition of the bed of that stream, as to its connection with the sewer of the city, or as to the chances of its connection with any surface drainage that may arise. If you should find, on the evidence in this case, that the damage to these premises was caused by the condition of the channel, that is, if it was so filled up with ashes or other matter on March 21 as to affect the rights of the plaintiff, or if you find that on that date there was any discharge to a great amount from the sewer of the city so as to cause this overflow upon the plaintiff's land, or any discharge of surface water, the plaintiff would not be entitled to recover for damages suffered by reason of her own conduct in filling up that stream, nor would she be entitled to recover any damages by reason of the discharge of the sewers or of surface water into that stream so as to fill up her cellar. . . . If you find there was evidence of such a discharge, and that the defendant contributed by its act to the increase of the volume of water that was discharged upon the plaintiff's land, then the plaintiff would be entitled to recover the precise amount of damage caused by the defendant's act. The plaintiff would not be entitled to recover from the defendant what damage was caused to it by the acts of the city or the fact that sewers passed through that street and discharged its sewage in such a way as to fill up the stream."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*F. P. Goulding,* for the defendant.

*J. E. McConnell,* for the plaintiff.

KNOWLTON, J. The evidence tended to show, and the jury found, that the plaintiff was the owner of land adjacent to a watercourse; that the defendant owned land through which the water flowed after passing the premises of the plaintiff; that the defendant was under a contract with the Putnam Machine Company, from whose mill the water flowed through the watercourse over the defendant's land, not to put any building or other erec-

tion on the defendant's land in such a way as to interfere with the flow of the water, and that it constructed a grating across the watercourse near the line of its land, which obstructed the flow and set the water back upon the plaintiff's land to her damage. That the plaintiff's premises were so situated as to be likely to be injured if the water was set back, and that the defendant, under its contract with the Putnam Machine Company, owed a duty to the plaintiff and other landowners similarly situated, was not questioned.

The evidence tended to show that the grating constructed by the defendant would not have materially obstructed the flow of water if the water had. been clear, and that the trouble came from rubbish, including a piece of canvas, that accumulated on the grating and prevented the passage of the water.

The only exceptions were to the instructions and the refusals to instruct in regard to the duty of the defendant in reference to substances floating in the water which were put there by third persons negligently or without right. The defendant contends that, under its contract with the Putnam Machine Company, it is not obliged to provide for the flow of water in which rubbish thrown or carried into the stream without its fault is floating in such a way that it would accumulate and obstruct the flow if a screen were constructed to stop the passage of the rubbish. The presiding judge instructed the jury, in substance, that if the screen was an obstruction which might be expected to set back the water of the stream under such conditions as would be likely to arise, and as the defendant might reasonably anticipate and provide against, it would be no defence that these conditions arose from the negligent acts of third persons, without which the injury would not have happened. He left it to the jury to determine whether the defendant adopted a proper method of providing for the flow of water in connection with the foreign substances that were in it, and told them that if the defendant or its officers used the diligence of ordinarily prudent men under the circumstances they must return their verdict in its favor.

We do not find that the rights of the defendant were prejudiced by the instructions given, or by the refusal to give the instructions requested. It was plainly the duty of the defendant to refrain from putting obstructions in the stream which

would be likely to set back the water in the condition in which, it might reasonably be expected to come, even though its condition might be caused in part by the negligence of other persons. *Lawrence* v. *Fairhaven*, 5 Gray, 110. *Salisbury* v. *Herchenroder*, 106 Mass. 458. *McCauley* v. *Norcross*, 155 Mass. 584. *Smith* v. *Faxon*, 156 Mass. 589.

Although the watercourse was artificially constructed, it was rightfully located and maintained. The Putnam Machine Company had a right to have the water flow on without obstruction. The defendant had entered into a contract to refrain from obstructing it. Everybody whose property was liable to be affected by setting back the water had a right to exemption from disturbance by an interference with its flow. It is immaterial whether the plaintiff had acquired rights by prescription. The liability of the defendant in reference to obstructions caused by it which would naturally injure the plaintiff's property was the same as it would have been if the parties had been riparian proprietors upon a natural watercourse. If there was any inaccuracy in any of the instructions, it did the defendant no harm.

*Exceptions overruled.*