JESS HAPPY, Respondent, v. WALTER S. KENTON and THOMAS CHESTER WHITE, Appellants, No. 42568—247 S. W. (2d) 698.

Division One, March 10, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, April 14, 1952.

W. A. Franken, John Franken, Dudley D. Thomas and Robert E. Coleberd for appellants; Lawson, Hale & Coleberd of counsel.

*Wherritt & Sevier, Wilson D. Hill* and *Harry A. Hall* for respondent.

COIL, C.—Appeal from judgment entered upon jury's verdict for $11,000 awarded plaintiff-respondent for loss of growing crops, and reasonable rental value of land made inaccessible by reason of water thereon, as a result of a dam allegedly unlawfully constructed by defendants-appellants. We shall refer to the parties as plaintiff and defendants.

Defendants contend that: the court erred in refusing to direct verdicts for them at the close of all the evidence, in giving instructions 1 and 3; and that the verdict is excessive.

We have concluded for the reasons to be stated that the judgment should be affirmed.

Extending across the county line between Ray and Carroll Counties is Snowden Lake. This lake is roughly U or V shaped with the bottom of the U or V to the north and its sides extending generally southwest and southeast. It has existed as a natural depository for waters from surrounding areas for an indefinite time, but certainly during all the period covered by the testimony in this case—about 50 years. The size and shape of the lake varied from year to year depending upon the seasons, i. e., the amount of rainfall and snow. It has no source of water other than drainage from the surface of the surrounding area. Due south of the lake, approximately 1-1/4 miles, is the Missouri River.

The natural contour of the lands adjacent to the lake on the west and south is such that water runs from them eastwardly or north-

wardly into the lake. Prior to 1944, when the water in the lake reached a certain height, it would flow southeastwardly out of the lake at its southeast extremity. The lake also drains certain land lying to the north of the north bank of the lake by means of a tile drain later replaced by a wide ditch, which land, but for these drainage facilities, would not drain into the lake.

Defendant Kenton owns land south and southeast of the southeast end of the lake and defendant White owns land adjoining land of defendant Kenton on the south and other land between the lake and the Missouri River. Plaintiff farms land as a tenant, some of which adjoins a road running generally along the south side of the lake at a point near the southwest end of the lake. Plaintiff, for purposes of this suit, is assignee of any claim for damage which the owners of the land he farms may have had.

Prior to the latter part of 1943, water from this lake would at times flow southeastwardly across portions of the lands of each of the defendants and eventually into the Missouri River. In the latter part of 1943, defendants constructed a levee or dam close to the north edge of the property of defendant Kenton across the place where prior to its construction the water from this lake flowed southwardly. As a result of the dam, the size of the lake was greatly increased, perhaps as much as three or four times it largest size prior to 1944, and at times water was caused to overflow at the southwest end of the lake onto the land farmed by plaintiff and at other times water was caused to stand on portions of plaintiff's lands, which water would otherwise have flowed into the lake.

Plaintiff at the trial proceeded and submitted his case to the jury on the theory that defendants by constructing the dam had obstructed a natural watercourse and were thereby liable for ensuing damages. Defendants contended and contend that they did not obstruct a natural watercourse, but only prevented surface water from flowing across their lands, which they say they could rightfully do. We make clear that plaintiff did not below and does not here contend that defendants obstructed a drain to which plaintiff claimed prescriptive rights. Nor does he contend that defendants negligently and recklessly dealt with surface water to his detriment. The issue then, on this appeal relating to the propriety of the refusal of defendants' motions for directed verdicts, has been narrowed to the question of whether defendants obstructed a natural watercourse. We assume, without deciding, that the overflow water from Snowden Lake and the water prevented from entering the lake was surface water.

Many cases have been written and much has been said concerning the relative rights and duties of landowners with respect to natural watercourses and with respect to their treatment of surface waters. It has often been said that in Missouri we adhere to and

enforce the "common law rule" as opposed to the "civil law rule." Whether the rule in this state is properly denominated "the common law rule" has been questioned. See, Farnham on Waters and Water Rights, Vol. 3, §§ 889(a)-892, pp. 2586-2620. However that may be and irrespective of terminology, Missouri is committed to the doctrine that one may not obstruct a natural watercourse without liability for ensuing damages to others, but that one may otherwise treat surface waters as a common enemy and obstruct their flow without liability for ensuing damages so long as he does so reasonably and not recklessly or negligently. Goll v. Chicago & A. R. Co., 271 Mo. 655, 665, 666, 197 S.W. 244, 246, 247; White v. Wabash R. Co., 240 Mo. App. 344, 351, 352, 207 S.W. 2d 505, 508, 509; Beauchamp v. Taylor, 132 Mo. App. 92, 95, 96, 111 S.W. 609, 610; City of Hardin v. Norborne Land Drainage Dist. of Carroll Co., 360 Mo. 1112, 1120, 232 S.W. 2d 921, 926; Abbott v. Kansas City, St. J. & C. B. R. Co., 83 Mo. 271, 286, 53 Am. Rep. 581.

 The courts of this state in determining whether a given drainway or waterway constitutes a natural watercourse, have many times approved the definition of a natural watercourse found in a Wisconsin case and quoted in Benson v. Chicago & A. R. Co., 78 Mo. 504, as follows: "There must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is the mere surface water from rain or melting snow, and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not in legal contemplation water courses." 78 Mo. l. c. 514.

An examination of a number of cases in this state which have decided the question of whether a given waterway is a natural watercourse within the definition above or similar definitions have reached, of course, different conclusions based upon the particular circumstances in each case. For example, in Gray v. Schriber, 58 Mo. App. 173, it was held that a natural depression over plaintiff's land was not a natural watercourse. In Benson v. Chicago & A. R. Co., supra, we held that the "so-called waterfalls were nothing but depressions in the land, dry except when it rained. There were gullies, but dry except in freshets. The whole land was cultivated." 78 Mo. l. c. 514. In St. Louis I. M. & S. Ry. Co. v. Schneider, 30 Mo. App. 620, it was held that a certain bayou was not a natural watercourse. On the other hand, in Place v. Union Township, Mo. App., 66 S. W. 2d 584, it was held that a slough which was shown to be a *natural drain*

was something more than a "mere temporary conduit of surface water" and that the trial court did not err in finding liability for obstructing it. Webb v. Carter, 121 Mo. App. 147, 98 S.W. 776, decided that a slough which was in effect an auxiliary channel to carry water from above to below plaintiff's land was a natural watercourse. In Keener v. Sharp, 341 Mo. 1192, 111 S.W. 2d 118, we held that a certain bayou connecting a lake with the Mississippi River was a natural watercourse.

These are some of the legion cases in this state considering this troublesome question. Space forbids a detailed summary of the cases here, but an analysis of them justifies, we think, the conclusion that while we have adhered generally to the "common law doctrine" of the right of a landowner to treat surface water as an enemy and, as a consequence of that rule, have required the evidence to show the existence of a natural watercourse as prerequisite to liability for obstructing the flow of surface water therein, nevertheless, in determining whether a given drain is a natural watercourse, we have considered the function of the drainway as it then existed, rather than making the determination depend wholly upon whether a given waterway fitted precisely some approved definition of natural watercourse. Some of the specific applications of the "common law rule" in this state may have resulted from a conclusion that this rule prohibits making any distinction between the various types of natural drainways and their particular functions but, on the contrary, makes it essential to hold that unless a drainway or waterway is in fact a natural watercourse then one may obstruct the flow of surface water therein without liability for ensuing damages. See again, Farnham on Waters and Water Rights, supra; and see, 56 Am. Jur., Waters, § 6, p. 495 and § 75, p. 562.

However this may be, we have concluded for the reasons hereafter stated that the waterway in this case should be considered as, and treated as, a natural watercourse and that a reasonable application of our "common law rule" does not preclude this conclusion.

The evidence considered most favorably from the standpoint of the plaintiff, which we must do on this appeal, shows that sometime during the years 1902 to 1906 certain landowners in the area in question, by means of teams and slips, constructed a ditch beginning at the Missouri River running northwardly to a swampy area, then northwestwardly through this area, then north for a short distance, then northeastwardly, then northwardly to the southeast end of Snowden Lake and on through the lake or the lake bed to a place near the southwest end of the lake; that in constructing this ditch a natural draw or depression or drainway was followed throughout its entire length; that this natural draw or depression constituted a natural drainway from Snowden Lake prior to the construction of the man-made ditch.

There is an abundance of evidence adduced by plaintiff, defendants' evidence to the contrary notwithstanding, that since the construction of this ditch, waters from Snowden Lake have flowed through it to the Missouri River. The evidence shows that since the construction of the ditch, there has been a definite channel in which water flowed most of the year; that there was a constant source of supply from the waters of Snowden Lake; and that it emptied into a natural watercourse, the Missouri River. An analysis, however, of the testimony of the many witnesses whose testimony may be construed favorably to plaintiff shows that all of them, with the exception of one, dealt with the waterway in question after the construction of the ditch.

One witness testified that prior to the construction of this ditch there was natural drainage through the same course that the ditch follows; that there was a natural depression in the land which had a depth and width; that its width varied between 100' and 500' and that its depth was such as would be described as a "low draw"; that one had no trouble in discerning the depth and the banks on the sides of it and no trouble in following its course; that through this "natural drain" the water eventually got to the Missouri River; that prior to the construction of the ditch the lake drained through this "draw" satisfactorily but did not drain "as low as it did" after the ditch was constructed. The witness further testified that he assisted in the construction of the ditch sometime between 1902 and 1906 and that it was placed in and followed exactly this natural drainway from Snowden Lake to the river.

This same witness, however, in further describing the condition of the ground in question prior to the construction of the ditch, said there was no sign of a ditch or anything through there, that it was just low ground, and that the only time water ran through those depressions was in times of heavy rains or when Snowden Lake overflowed. He also said that he had meant to say he saw water running in this ditch, or "natural drain" as he called it, prior to 1904 but not prior to 1902, which, together with his testimony that the ditch was begun in 1902 and completed sometime between then and 1906, makes it not too clear as to whether the witness was describing the condition of the depression or drainway prior to the construction of the ditch or thereafter. However, giving plaintiff the benefit of a most favorable construction of the witness' testimony, we may conclude that there was substantial evidence from which the jury could reasonably find that prior to the construction of the ditch there was at the very least a natural drainway or waterway from the southeast end of Snowden Lake to the Missouri River.

In the view we take of this case, it is unnecessary for us to determine whether there was sufficient evidence from which a jury could reasonably find that this natural drainway or waterway which existed prior to the construction of the ditch then constituted a natural water-

course. This, for the reason that, as stated, there is abundant evidence that after the ditch was placed in the natural drainway the ditch and the natural drain did together have all the attributes of a watercourse. We are convinced that such a watercourse should be treated as a *natural watercourse* in so far as concerns the liability of defendants for obstructing it. In other words, we think a natural drainway improved by an artificial ditch, following the exact course of the natural drainway, under circumstances indicating that it was to be permanent, and which combination thereafter meets the requirements of a "natural watercourse" should be treated as a "natural watercourse." And this, even though the "natural watercourse" came into existence with the aid of a "man-made" ditch. It may be fairly inferred from the evidence that the improvement was made under circumstances indicating that the combination was to be permanent, i.e., the ditch was to remain an integral part of the natural drain. And, indeed, in this case the ditch in the natural drain has from time to time been cleaned and improved but never obstructed until the construction by defendants of the dam or levee.

In Brill v. M-K-T R. Co., 161 Mo. App. 472, 144 S.W. 174, defendant dug a ditch from a point where a creek (natural watercourse) crossed under its railroad track to a point south where the ditch again joined the creek. Thus the course of the water was changed from the creek to the ditch for the length of the ditch. This ditch had remained for 35 years at the time of the litigation involved. Plaintiff's lands were flooded, which he averred was due to defendant building a dam at the place where the ditch joined the creek on the north. The court said at page 475:

"It is thus seen that defendant, in damming the ditch, obstructed an artificial watercourse, which had the resulting effect to injure plaintiff's crops. The law is stated to be that:

" 'If the artificial channel is substituted for a natural one, or is created under such circumstances as indicated that it is to be permanent and to be a watercourse the same as though it was created by nature, riparian rights may attach to it.' [3 Farnham on Water and Water Rights, p. 2430, sec. 827b.]

"The same author (2 vol., p. 1837, sec. 575) again states that:

" 'In order to make the rule governing the obstruction of watercourses applicable in any case, a watercourse must be found to exist. But, if a watercourse, *in fact*, exists, the fact that it is not an ancient one will not confer a right to obstruct it. *And the rule is not changed by the fact that the water was flowing in an artificial channel.*' (Emphasis ours).

"Judge Cooley said, in Freeman v. Weeks, 45 Mich. 335: 'If, by common consent, the ditch was dug as a neighborhood drain and has remained open as a watercourse for a series of years, it ought to be

governed by the same rules that apply to the cases of other watercourses.'

"In Babbitt v. Safety Fund Nat. Bank, 169 Mass. 361, the court said: 'Although the watercourse was artificially constructed, it might be rightfully located and maintained. . . . . Everybody whose property was liable to be affected by setting back the water had a right to exemption from disturbance by an interference with its flow. It is immaterial whether the plaintiff had acquired rights by prescription. The liability of the defendant in reference to obstructions caused by it which would naturally injure the plaintiff's property was the same as it would have been if the parties had been riparian proprietors upon a natural watercourse.' "

We conclude that the court did not err in refusing defendants' motions for directed verdicts.

Instruction 1 given on behalf of plaintiff after hypothesizing the obstruction of a natural watercourse by the dam, then proceeded: to cause water to "extend to and stand on a portion of that land which plaintiff had leased as testified to in evidence here, *or to stand so near said land and so close to the surface thereon as to keep said land damp and wet by water from said lake seeping through the soil,* * * *." The portion of the instruction italicized is attacked by defendants as submitting an issue not within the scope of the pleadings. Defendants say that because this issue was without the scope of the pleadings and was submitted in the disjunctive, the instruction is thereby prejudicially erroneous.

We cannot agree with defendants' contention in this regard. Plaintiff's petition upon which the case was tried avers, among other things, that the dam obstructed and closed the watercourse "and caused the waters * * * to become impounded and of great depth, flooding and spreading out over *the adjacent land to the north* and west *of said dam,* and backing up, inundating and overflowing large portions of the land used by plaintiff in his farming operations * * * rendering the same worthless and unfit for cultivation and use." (Emphasis ours). The foregoing averment may be construed as a general averment that impounded waters flooded not only portions of plaintiff's land but also "adjacent land to the north and west of said dam," which the evidence showed included land other than plaintiff's and that this spreading out over adjacent land contributed to rendering plaintiff's land unfit and worthless for cultivation and use.

Further, in some of the paragraphs wherein damages are averred for the years 1944 to 1949 inclusive, we find this language: "the impounding of said water as aforesaid flooded *and ruined* 20 acres of plaintiff and plaintiff's assignors land, rendering the same unfit for cultivation * * *." (Emphasis ours). Like language is used to aver damages for the years 1946, 1947, 1948, and 1949. Con-

struing the averments of the petition most favorably to plaintiff and resolving all doubt as to interpretation in favor of the pleader, as we must do in determining whether there is a general averment of damage from water standing near plaintiff's land which damaged it by seepage, we conclude that the averments of the petition were sufficient to include the claim for damages due to seepage of water standing close to plaintiff's land. Moll v. Pollack, 319 Mo. 744, 762, 8 S.W. 2d 38, 45[6, 7].

It seems a fair inference from the language used that plaintiff was seeking damages for all injury to his crops and land by reason of water held and backed up as a result of the dam. Jordan v. St. Joseph Ry. Light, Heat & Power Co., 335 Mo. 319, 327[3], 73 S.W. 2d 205, 209[10-13].

Instruction 3 given on behalf of plaintiff was:

"The Court instructs the jury that if you find for the plaintiff, then in fixing the amount of his actual damages you will be guided by the following:

"A. If you find on account of the erection of said dam plaintiff was prevented from raising any crop on a portion of any land during or in any of the years, 1944-1949 inclusive, if any, then the measure of damages for the amount of land on which crops were prevented from growing is the fair rental value of such portion.

"B. If you find that on account of the erection of said dam the crops grown on any part of said land which this plaintiff had rented during or in any of the years 1944-1949 inclusive, if any, were damaged, then the measure of damages for the crops thus injured is the difference between the value of the crops which could ordinarily and reasonably been raised on said land in similar seasons if said dam had not been constructed, and the value of the crops actually raised by plaintiff."

Defendants contend that the court erred in giving this instruction. Defendants complain only of paragraph B. They say first that "The question for the determination by the jury was the difference between the value of the damaged crops actually produced and the value of such crops in the respective years that would have been produced had the dam not been there. It was not a question of what *could* have been produced on the land in similar seasons, but what *would* have been produced if the dam had not been there." It is clear that this objection resolves itself into the propriety of the word "could" as opposed to the word "would." While the use of the word "would" would have been more accurate, we believe the jury was not misled by the use of the word "could" instead of "would." We think the jury must have understood that they were considering the difference in the value of the crops which they believed from the evidence plaintiff would have raised on the land in question and the value of the crops actually raised by plaintiff.

We understand, defendants also contend that paragraph B of instruction 3 improperly states the measure of damages. While in Jones & Jones v. Cooley Lake Club, 122 Mo. App. 113, 116, 117, 98 S.W. 82, 83, the court said that the measure of damages for injury done to a growing crop is ''The difference in value of the crop produced from that which was ordinarily produced on the land in, like seasons'', nevertheless, we think there can be no question but that the measure of damage for injury to or destruction of a growing annual crop is, in the case of total destruction: the value of the crop at the time and place of destruction; and as to injury or partial destruction: the difference between the value of the crop immediately before and immediately after the injury. Boggs v. M-K-T R. Co., 336 Mo. 528, 534, 535, 80 S.W. 2d 141, 144, and cases there cited; Jones v. Chicago, B. & Q. R. Co., 343 Mo. 1104, 1128, 125 S.W. 2d 5, 18[27]; Anno., 175 ALR 159-228, and particularly Missouri cases cited in § 3, p. 164, § 12, p. 174, and § 35, p. 203.

However, to determine the value of a growing annual crop at the time and place of destruction or its value immediately before and immediately after any injury, we have approved a method to ascertain the amount of damages. This, by a consideration of evidence showing the maturity value of the probable crop but for destruction or injury, and by a deduction therefrom of the value of the labor and the expense which, subsequent to its injury or destruction and but for it, would have been required to mature, care for, and market the crop. It is apparent that paragraph B of instruction 3 states the *method* of ascertaining the damages sustained as the *measure* of damages. There may be instances in which the statement of the *method* of ascertaining the damages as the *measure* of damages would be prejudicial to a defendant and thereby make an instruction so doing reversibly erroneous. In this case, however, we think the jury could not have any more accurately determined the damages had the instruction included words to the effect that the measure of damages for the crops destroyed is the value of the crops in the field at the time of destruction and the measure of damages for the crops injured is the difference between the value of the crop in the field immediately before and immediately after the injury; and then for the instruction to have proceeded to tell the jury that in determining these damages, you may consider the difference between the value of the crops which would ordinarily have been raised on the land in similar seasons if the dam had not been constructed and the value of the crops actually raised by plaintiff. It is true that the paragraph makes no reference to crops totally destroyed, but refers only to crops damaged, even though the evidence showed both types of damages. Inasmuch as the method of calculating the damage is the same in either event, and inasmuch as total destruction is included in

the general word "damaged," we think the jury was not misled to the prejudice of the defendant.

It is further true as contended by defendants that paragraph B of the instruction does not specifically tell the jury that in calculating the difference between the value of the crop which would have been raised compared with the value of the crop actually raised that they were to deduct the value and amount of labor and expense which would have been required to mature, care for, and market the crop. The evidence, however, as adduced by plaintiff, did take these cost items into account and the ultimate figures as to probable value and actual value were figures from which had been deducted these items of cost.

The ultimate question, as to this instruction, in the light of the attacks made, is whether it, considered with the evidence as to damages in this particular case, would lead the jury to believe that they should *assume* that, but for the dam, the crops in question would have matured and thereby eliminate from consideration by them the risks of weather and seasons to which the growing crop would have been subjected.

It is our conclusion that instruction 3, while not a model and not one we suggest for use in like cases, nevertheless contains no misstatement or misdirection, and, *under the evidence in this case,* sufficiently enabled the jury to arrive at the amount of damages sustained by plaintiff after a consideration of the proper elements of damage. If defendants wished an instruction clarifying, limiting, or detailing the elements of plaintiff's damages, or further directing the jury as to the method of estimating them, it was the duty of defendants to have requested such additional instruction. Hancock v. Kansas City Term. R. Co., 339 Mo. 1237, 1245, 1246, 100 S.W. 2d 570, 573, 574; Reed v. Cullor, Mo. App., 32 S.W. 2d 296, 298[4].

 Defendants contend the verdict is excessive. The sole basis for this contention is that the verdict includes amounts as damages for the years 1944 and 1947 and that the evidence conclusively shows that in these years any damage to plaintiff was caused by flood waters from the Missouri and Crooked Rivers and not by the dam or levee in question.

Suffice to say, there is substantial evidence in the record which if believed by the jury justified them in finding that plaintiff sustained damages in 1944 and 1947 directly caused by the dam independent of the flood waters from the rivers. It is true that the evidence showed without dispute that river floods did cover plaintiff's lands in 1944 and 1947. It is further true that the evidence showed without dispute that some portion of the dam erected by defendants washed out during the course of each of these floods. However, it is also true that plaintiff testified and was corroborated to some extent by other witnesses to the effect that if it had not been for the dam in 1944 and

1168

1947 the flood waters from the Missouri and Crooked Rivers would not have remained on portions of his land so long but would have flowed into Snowden Lake and out its southeastern end; that in such event, plaintiff could have used the land during the years in question.

Defendants adduced substantial evidence supporting their contention that plaintiff suffered no damage as a result of the dam in 1944 and 1947. This conflict in testimony was for the jury to resolve. The trial court overruled defendants' motion for new trial which included the ground that the verdict was against the weight of the evidence.

The judgment is affirmed. *Van Osdol* and *Lozier, CC.*, concur.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the court. All the judges concur.