**George G. BORGMANN et al., Plaintiffs-Appellants,**

v.

**FLORISSANT DEVELOPMENT COMPANY et al., Defendants-Respondents.**

**No. 35045.**

Missouri Court of Appeals,
St. Louis District,
Division One.

Oct. 22, 1974.

---

David R. Swimmer, Clayton, for plaintiffs-appellants.

Ziercher, Hocker, Tzinberg, Human & Michenfelder, Albert A. Michenfelder, Jr., Edward K. Fehlig, Clayton, for defendants-respondents.

KELLY, Judge.

The issue presented in this appeal is whether a landowner may develop a tract of land by building an apartment complex of 218 units plus ancillary improvements thereon and collect surface water into a weir located on his property and permit the overflow to be discharged onto the adjoining tract of land.

This appeal is from a judgment of the Circuit Court of St. Louis County denying to the plaintiffs-appellants (hereinafter the plaintiffs) an injunction restraining the defendants-respondents (hereinafter the defendants) from collecting and discharging surface water onto plaintiffs' land. We affirm.

■ In court tried equity cases, appellate courts must review the case de novo upon both the law and the evidence, giving deference to the opportunity afforded the trial court to judge the credibility of the witnesses, and not disturb the judgment of the trial court unless clearly erroneous.

Plaintiffs purchased the triangular tract of land, the subject of this suit, comprising approximately 2.9 acres of land improved by a farmhouse and barn situated in north St. Louis County on May 4, 1970. Defendant Florissant Development Company, a Missouri Corporation, is the developer of the Horizon Village Apartments on land abutting plaintiffs' tract and defendants, Harold Lieberman and Allan Lieberman, are partners d/b/a as Horizon Village Apartments Company. Plaintiffs' tract of land fronts 376 feet on Kemper Avenue, a platted but unimproved road, with its apex located at the northernmost boundary of the tract and adjoins defendants' tract at that point. From the apex of the triangle, plaintiffs' tract extends along· the south boundary line of defendants' tract a distance of 452.38 feet in a more or less southwesterly direction, and then in a south to north direction some 251.55 feet to the south side of Kemper Avenue. In 1971 defendant Florissant Development Company's predecessor in title obtained a rezoning of the entire tract of land adjoining plaintiffs' tract on the south for the construction of an apartment complex. After the Florissant Development Company took title it commenced the development of Horizon Village Apartments including construction of various storm sewers, drains and swales on its property for the collection and diversion of surface waters in accordance with plans approved by the St. Louis County Department of Highways and Traffic and the Waste Water Control Division of the St. Louis County Department of Public Works. This litigation grew out of the construction of the apartment complex and plaintiffs' contentions that defendants have constructed the system of storm sewers in a manner so as to change the flow of surface waters from "the natural water course" of the said surface waters and thus discharge large quantities of surface water onto plaintiffs' lands and into areas of plaintiffs' lands where no natural "drainage way or water course" existed prior to the construction.

In the trial court the case was tried for the greater part on the basis of the testimony of engineers relative to how the surface waters flowed prior to development of

defendants' properties and how they would flow thereafter.

Plaintiffs, in their case in chief, offered two witnesses: Mr. Borgmann, one of the plaintiffs, and Mr. Roy W. Phelan, the chief design engineer for the St. Louis County Department of Highways and Traffic. Mr. Borgmann's testimony was directed primarily to the effect of the topographical and surface water changes observed by a lay person before and after the development of the apartment complex by the defendants. The thrust of his testimony was that prior to the development of the apartments he had no surface water problems of any import. Following their development, however, his ground remains soggy after a rain and water lies almost continuously on his barn lot, access road and lower pasture making it impossible to build a riding ring for the use of his horses. He has been unable to grow anything but weeds in the area where the surface water now flows and he cannot mow the weeds because his tractor bogs down in the mud. He cannot graze nor exercise his livestock because of the muddy condition of his pasture land. Plaintiffs introduced into evidence photographs showing the condition of the land prior to the development of the complex and subsequent thereto, the latter showing ponding and flooding of the land.

Mr. Phelan testified that he was familiar with the plans for the apartment development and gave testimony which shall be considered hereinafter with respect to the effect of the development on the flow of the surface water.

Defendants presented two witnesses in their case in chief: Mr. Maynes, the Vice-President in charge of construction for the corporate defendant, and Mr. Glen Borgard, an engineer. Mr. Maynes testified that since the development of the complex he has noticed water running across plaintiffs' land when there were rainstorms, but that he had never seen plaintiffs' land flooded. He admitted that he had seen the road "damp." Mr. Borgard's testimony, like that of a rebuttal witness called by the plaintiffs, Mr. Frank Mitchell, an engineer, shall be more fully considered in that portion of this opinion treating the engineering aspect of the case.

Plaintiffs' tract is situated on lower ground than defendants' tract of land and slopes northwardly to a low point at the north boundary of plaintiffs' tract. The land, along the joint boundary line of the two tracts, reaches high points at the extreme ends and the low point is located approximately at the mid-point of the common boundary line. The northeast corner has an elevation of 537 feet and the southwest corner, 534 feet. The low point of elevation is 528.8 feet along the common boundary line, a difference of approximately 6 feet, and 524 feet at the northern property line of plaintiffs' tract, a difference of almost 5 feet.

Preparatory to the development of the apartment complex, plans and topographical maps were presented to and approved by the St. Louis County Department of Highways and Traffic, Waste and Water Control Division without on-spot inspection by the governmental agency and in reliance on the documents submitted. The plans as originally approved on October 21, 1971, showed that drainage of the defendants' property would be by means of an 18 inch pipe extending through an easement to be obtained on the plaintiffs' tract and emptying into a pond to the north of the plaintiffs' tract and on the north side of Kemper Avenue. For some reason defendants were unable to obtain the proposed easement and changed the plans so that drainage of its property as developed would be through a concrete catch basin and a 10 foot weir situated on the defendants' property adjacent to the north common boundary line with plaintiffs' tract, and the surface waters would then be discharged onto plaintiffs' land from the weir. As constructed, the weir would dissipate the energy of the surface waters flowing into the catch basin because the pipes carrying the

surface waters were installed in such a manner that they discharge the surface waters from opposite ends of the weir and flow is further slowed by rip-rapping and the shape of the catch basin itself before the surface waters are discharged over the weir and onto plaintiffs' land. The contour lines on the second set of plans located the 528 foot elevation in a different location than shown on the original set of plans and the configuration of the contour lines for the 528 foot elevation were somewhat changed.

The testimony of the engineers for the parties to the litigation centered around the topographical maps and the effect of the development of the apartment complex on the drainage of the surface water from defendants' property onto plaintiffs' land. All three engineers testified that the weir was constructed so that it emptied surface water from the defendants' land into the same natural drainway on plaintiffs' land as nature had controlled the direction of flow prior to the development of the apartments. It was stipulated by the parties that prior to the development 3.58 acres of defendants' land drained surface waters onto plaintiffs' property; that subsequently, 3.4 acres of defendants' land channeled surface waters into the weir. The engineers further agreed that the weir was situated at the low elevation on the common boundary line of the properties. The critical issue was the effect of the weir with respect to the concentration of flow of the surface waters onto plaintiffs' property.

Mr. Phelan, a plaintiffs' witness, testified that the low point on the common boundary line of the two tracts was 528 feet and that this point was located approximately at the mid-point of the 450 foot common boundary; that this constituted a drop of some 6 feet from the maximum elevation of 534.2 feet at the southernmost end and 535.6 feet at the northernmost end of the boundary. At a distance 150 feet south of the low point the elevation was 530 feet and 100 feet north of the low point it was 532.8 feet. In his

opinion, this difference in elevation constituted a swale, i. e., an area of surface water run-off without definable banks, into which the surface waters from the defendants' 3.58 acre tract would flow in a "sheet flow type condition" along the greater part of the entire 450 feet of the common boundary, but with a concentration of surface waters at the low elevation point. He did opine that this runoff could not be confined fully to an area of 10 feet—the width of the weir—but, without further calculations, would not venture an opinion concerning what width or area of plaintiffs' property would receive the concentration of surface waters occasioned by the swale or the weir. He did state, however, that it was his opinion that 85–90% of the surface waters from defendants' tract would naturally flow through the area of the swale now occupied by the weir.

Mr. Borgard, defendants' engineer, testified that the area where the weir was constructed was a "natural drainageway" for the properties.

Mr. Phelan testified that prior to the construction of the weir the velocity of the surface waters flowing from defendants' tract was 3.5 feet per second and the volume was 6.82 cubic feet per second; that after construction, the velocity of the surface waters emanating from the weir was less than 5 feet per second (the approved standard for his Department) and the volume 9.86 cubic feet per second. Mr. Borgard's figures for these two factors were 2.99 feet per second velocity and 6.65 cubic feet per second volume before and 2.07 feet per second velocity and 9.86 cubic feet per second after. Mr. Borgard further testified that prior to the construction there was a "water spread" of 17.16 feet as the surface waters flowed through the swale at a depth of .225 feet and a 7.03 foot spread after construction. He conceded that by slowing down the flow of surface water the land over which it flowed would remain damp for longer periods than if the water was permitted to flow at its normal velocity through the swale. Mr.

Mitchell gave no opinion of the velocity or volume of the waters either before or after construction. He did, however, testify that the water spread before development would be 42 feet and subsequent to development, 6.6 feet by 1.113 feet deep.

The trial court found that prior to the development of the defendants' tract 3.58 acres drained surface water through a natural surface water channel across plaintiffs' land and thence to a pond; that the weir was constructed by the defendants at the low point and discharges surface water through the natural surface water channel; that the weir was constructed in accord with sound engineering principles and is an acceptable way of discharging surface water; that although the volume of surface water is increased, the velocity is not materially greater; that the drainage through the headwall and weir does not exceed the natural capacity of the drainway; that the water now flows through the same natural surface water channel; that any erosion is insignificant; that the surface water collecting around the plaintiffs' barn did not result from defendants' weir; and the court further found no credibility in the testimony of Mr. Mitchell because, it said, his testimony was based upon insufficient and erroneous factual data and was contrary to that of Mr. Phelan.

On appeal the plaintiffs contend that the trial court erred (1) in finding that prior to development a 3.58 acre portion of the property owned by the defendants drained surface water through a "natural surface channel"; (2) in finding that defendants' headway and weir were at "the low point of the 'natural surface channel'"; (3) in finding that any erosion that has resulted from the construction of the weir is "minimal and totally insignificant"; and, (4) in holding that the appellants were not entitled to relief because of the holdings in Haferkamp v. City of Rock Hill and Spain v. City of Cape Girardeau.

While none of the aforesaid Points Relied On by plaintiffs meet the standards set out in Rule 84.04(d), V.A.M.R. in that although they set forth briefly and concisely the actions and rulings of the court which are sought to be reviewed, they do not set out why these actions of the trial court are claimed to be erroneous, as the Rule requires. However, a reading of the argument portions of the brief of plaintiffs makes it apparent that the first three complaints are based on evidentiary grounds and the fourth on what the plaintiffs contend is a misapplication of the controlling law on the subject of surface waters.

We can dispose of the first three contentions of plaintiffs by holding that we find in the record evidence which we conclude will support the facts as found by the trial court in each of these respects. However, from our analysis of plaintiffs' contentions on appeal, the validity of the trial court's factual determinations depends upon the legal definition of 'a "natural surface channel" with respect to the collection and discharge of surface waters, and we must therefore examine the law in that respect.

We will not prolong this opinion with a lengthy discussion of the history of the law of surface waters in this State but will state the rule of law as it now is; and that is, a landowner in the reasonable use and development of his land may drain it by building thereon sewers, gutters and such other artificial water channels for the purpose of carrying off the surface waters into a *natural surface-water channel* located on his property without liability to the owner of neighboring land, even though such method of ridding his property of surface water accelerates and increases the flow thereof, provided that he acts without negligence, and provided further that he does not exceed *the natural capacity of the drainway* to the damage of neighboring property. Haferkamp v. City of Rock Hill, 316 S.W.2d 620, 625 (Mo.1958). What is actionable is (1) the collection of surface water into an artificial channel or volume and discharge of it in increased and destructive quantities upon the servient

estate to its damage, (2) the draining off of surface waters in such a manner as to exceed the natural capacity of the drainways and (3) the discharging of surface waters onto adjacent lands to which it would not naturally drain.

Much of the confusion in surface water cases is the result of semantics and the failure to distinguish the different methods employed by landowners to rid themselves of the "common enemy." One line of cases deals with those situations where the owner of a servient estate erects a dam for the purpose of diverting surface waters from the dominant estate and causes a back-flooding of the lands of the dominant estate. Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698 (1952). Another line, the drainage of surface water into a ditch on one side of a road and then the installation of drain pipes so that surface waters are diverted from their normal line of flow and onto plaintiffs' lands. Miller Land Company v. Liberty Township, 510 S.W.2d 473 (Mo.banc 1974). And still another line, those where a land developer has constructed sewers to gather the flow of surface waters and divert them into a "natural drainage channel" whereby they are discharged on an adjoining tract of land. Haferkamp, *supra*. There are other factual situations concerned with the control of surface water we need not explore in this opinion. These cases use terminology peculiar to their facts and necessary to a decision, but in doing so, they use indiscriminately such terms as "watercourse," "natural surface water channel," "natural drainage channel" and "natural drainway." It is this indicriminate use of terms which has, in our opinion, been the basis for plaintiffs' contentions in this case, that to constitute a "natural surface channel," as found by the trial court, there must be a channel with definable banks and a bed.

■ Plaintiffs rely on Happy v. Kenton, *supra,* as authority for their position. In doing so they make the common mistake of confusing "watercourse" with a "natural surface water drainway" and apply it in a case where it has no application. A "watercourse," which was the issue in *Happy*, has been defined as a living stream of water with well-defined banks, a channel and a bed; it need not run continuously but it must be fed from other and more permanent sources than mere surface water. Riparian rights attach to a watercourse. Anderson v. City of Jefferson, 262 S.W.2d 169 (Mo.App.1953); Happy v. Kenton, 247 S.W.2d, l. c. 701. A natural surface water channel or drainway (too frequently referred to in the opinions as a watercourse) is, on the other hand, a drainway through which an upper landowner may discharge surface waters from his land because it is via this drainway that nature provided for the flow of surface waters. It need not have banks or a bed; the contour of the topographical features of the land itself constitute the "channel" within which the surface water flow is contained. Even in *Haferkamp* the Court uses the terms "natural drainways" and "natural surface-water channel" to convey the same concept, when, 316 S.W.2d, l. c. 625, in discussing the courts which follow the "common enemy doctrine" it said:

"In those states purporting to follow the common enemy doctrine, where the question of the right of a landowner to collect surface water and discharge it into a natural drainway has been expressly raised, the courts 'have developed a qualifying rule which is, in substance, that a possessor of land is not privileged to discharge upon adjoining land, by artificial means, large quantities of surface water in a concentrated flow *otherwise than through natural drainways*' . . . (I)t may be said that the rule is, in substance, that a landowner in the reasonable use and development of his land may drain it by building thereon sewers, gutters and such other artificial water channels for the purpose of carrying off the surface waters into a 'natural

surface-water channel' . . . located on his property without liability to the owner of the neighboring land, even though such method of ridding his property of surface water accelerates and increases the flow thereof, provided that he acts without negligence, and provided further that he does not exceed the natural capacity of the drainway to the damage of neighboring property."

For this same principle the Court in *Haferkamp* invites one to see Annotation, What constitutes natural drainway or watercourse for flow of surface water, 81 A.L.R. 262; Case Note, 19 L.R.A.N.S. 167; Annotation L.R.A.1916F, at page 427; and Annotations in 5 A.L.R. 1530 and 36 A.L.R. 1463.

Acknowledging that no Missouri case has been found which directly and necessarily ruled on the right of a landowner, under "our modified common enemy rule," to collect surface water and discharge it into a natural drainway on his land, the Court in *Haferkamp* held that the land developers and the City, in the reasonable use and development of the land, could drain that part "in the natural watershed" of the sinkhole, and in doing so could collect surface water thereon in a 27 inch pipe laid in the bottom of the "natural drainway" for surface water from that part of the subdivision of the "watershed" of the sinkhole and precipitate it into "a natural drainway channel" thereon where the surface water from the drained area would otherwise naturally go, even though in doing so they might increase and accelerate the flow of the surface water in its natural channel onto the lands of the plaintiffs. In Skaggs v. City of Cape Girardeau, 472 S.W.2d 870 (Mo.App.1971) and again in Spain v. City of Cape Girardeau, 484 S.W.2d 498 (Mo. App.1972) the terms "natural surface water channel" and "drainway" are used in the reiteration of the rule without any distinction being noted because it was not necessary to do so in the context of the opinion. Both of these cases grew out of the same set of facts; some street improvements made by the City which resulted in a collection of surface waters in collection basins on either side of the improved road and the channeling of the waters through a concrete tile into a ditch from whence the surface waters entered an open drain on the property of the co-defendant and then discharged onto plaintiffs' land. In *Skaggs*, the Court, 472 S.W.2d 1. c. 874, said: "From the evidence adduced it would appear that defendant city did not change the natural flow of water by diverting it from another watershed, or by channelling it away from its natural drainage into another area and then onto plaintiffs' property. Rather, the evidence tends to establish that the city by improving the streets, and constructing gutters, sewers and other artificial channels has accelerated and increased the rate of flow *from the same area previously served by a less efficient drainage system to the lowest point of the watershed, where the water had previously flowed but at a slower pace. There is no evidence that the city changed or in any way tampered with the topography of the ground composing the watershed or any of the drainways or channels which led away from it."* (Emphasis supplied).

93 C.J.S. Waters § 117 (1956) defines a water course as follows: "A ravine, swale or depression through which the surface water uniformly or habitually flows . . . ., although it has been held under some statutes that the term was used in its ordinary meaning, as one having a distinct channel, and excludes mere depressions."

Lambert v. Alcorn, 144 Ill. 313, 33 N.E. 53, 56 (1893) holds: "If the conformation of the land is such as to give to the surface water flowing from one tract to the other a fixed and determinate course, so as to uniformly discharge it upon the servient tract at a fixed and definite point, the course thus uniformly followed by the water in its flow is a watercourse . . .

Doubtless such watercourse can exist only where there is a ravine, swale, or depression of greater or less depth, and extending from one tract onto the other, and so situated as to gather up the surface water falling upon the dominant tract, and to conduct it along a definite course to a definite point of discharge upon the servient tract. But it does not seem to be important that the force of the water flowing from one tract to the other has not been sufficient to wear out a channel or canal having definite and well-marked sides or banks. That depends upon the nature of the soil, and the force and rapidity of the flow. If the surface water in fact uniformly or habitually flows off over a given course, having reasonable limits as to the width, the line of its flow is, within the meaning of the law applicable to the discharge of surface water, a watercourse."

█ We conclude that, consistent with the state of the law of surface waters in this State, the foregoing definition of watercourse is the proper one to be applied in this case and we therefore rule this point against plaintiffs and find that there is credible evidence that prior to the development of the defendants' apartment complex a 3.58 acre portion of defendants' property drained surface waters through a natural surface water drainway or channel; that the "headway" or catch-basin and weir were situate at the low point of the natural surface water drainway or channel and that any erosion which has resulted from the construction of the weir was minimal and totally insignificant.

With respect to plaintiffs' fourth point we find no error in the trial court's application of the rule of law with respect to surface waters announced in Haferkamp, *supra,* and Spain, *supra*.

We affirm.

SIMEONE and WEIER, JJ., concur.