E. S. BOLLINGER, Mary M. Bollinger, and Terry Bollinger, Respondents,

v.

Louis HENRY, Appellant.

No. 49747.

Supreme Court of Missouri,

Division No. 2.

Jan. 13, 1964.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 10, 1964.

Paul A. Mueller, Jr., Jackson, J. B. Schnapp and Maurice B. Graham, of Schnapp, Cooper & Graham, Fredericktown, for appellant.

Eugene S. Heitman, Marble Hill, Stephen N. Limbaugh, Limbaugh, Limbaugh & Russell, Cape Girardeau, for respondents.

STOCKARD, Commissioner.

Defendant has appealed from the judgment of the trial court in plaintiffs' suit to quiet title and for an injunction to prohibit defendant from taking water from a millrace. The issues on this appeal include the correctness of the determination of title to real estate. Therefore, this court has appellate jurisdiction.

On September 2, 1936, E. S. Bollinger and his wife purchased from J. B. Dolle and others 2.40 acres of land on which was located a mill. At the same time and by the same deed they also purchased an irregular strip of land, described by metes and bounds, approximately one mile in length and varying in width (the width is not shown but from an exhibit it appears that the width would vary from approximately 20 feet to more than 100 feet) and extending from the 2.40 acre tract northwesterly to and including a portion of the Big Whitewater Creek, a nonnavigable stream, where there was located a then deteriorated log dam. On this irregular strip of land was located a millrace which carried water from the pool caused by the dam to the mill and then through a tailrace back to Big Whitewater Creek. We shall hereafter refer to this irregular strip of land as the millrace strip.

The dam, millrace and mill were first built within a short time after 1800, and for approximately 75 years prior to 1936 had been owned by the Dolle family. After E. S. Bollinger bought the property he rebuilt the dam with concrete, and Terry Bollinger, his son, operated the mill under an oral lease or agreement and engaged in grinding flour, corn meal and livestock feed. In the "early forties" the grinding of feed by use of water power was discontinued and thereafter it was ground by use of a gasoline powered engine. In April 1958 the grinding of flour was completely discontinued, and there is nothing to indicate any intention to resume that operation. Since April 1958 the mill has been used only

one day each week, Saturday, to grind corn meal by use of water power.

Prior to the above mentioned conveyance to E. S. Bollinger, the land on both sides of the millrace belonged to the Dolle family. In 1943 appellant and his wife purchased a tract of land from Clyde Whaley, who a short time previously had purchased it from the Dolle family. This tract of land adjoined the upper one third of the millrace strip on the southeast side and apparently it also bordered upon or included a portion of Big Whitewater Creek above the dam. Appellant also acquired land adjoining the millrace strip on the northeast side which also bordered upon or included a portion of Big Whitewater Creek below the dam. Other persons owned land below that of appellant which adjoined the millrace strip.

The millrace is rather crooked and is 12 to 14 feet in width. The water has an "average" depth of 3 feet when a gate located in the millrace is closed, but when the gate is open the water is 12 to 15 inches in depth and running rapidly. The location of this gate in the millrace is not precisely shown but it apparently is near the mill. At one time either E. S. Bollinger or Terry Bollinger, or both, asked appellant, or appellant's son who was speaking for his father, for permission to change the location of a small portion of the millrace to eliminate a sharp curve, and after viewing the area of the proposed change permission was given. Terry Bollinger said that this permission was obtained in 1946 and that the change was made at that time. E. S. Bollinger stated that a change in the millrace was "cut" with appellant's consent and that "it's that way yet," but he did not say when the change was made. Appellant and his son stated that this change occurred in 1950, and this is substantiated by Jack Latimer, the dragline operator for the contractor who dug the new channel, who said it was made "around Thanksgiving in 1950." Latimer also testified that he did not start to work for the contractor until August of 1949. Both E. S. and Terry Bollinger deny that they moved the millrace off the millrace

strip, and Terry Bollinger testified that they asked appellant's permission only because of "good manners, I suppose." However, two surveys made by the county surveyor shortly before the trial of this case, one of which was made at the request of Everett Bollinger, another son of E. S. Bollinger, unquestionably show that at the place in question the millrace leaves the millrace strip and cuts across land included in the description of land conveyed to appellant by Clyde Whaley and which is not included in the description of any land conveyed to E. S. Bollinger.

For seven years previous to the trial appellant pumped water each year from the millrace for irrigation purposes during July and August, or the "dry part of the summer," except two years when irrigation was not needed. According to Terry Bollinger, appellant pumped "from different places," and he said that appellant asked permission to do so for one day, and that permission "for the one day" only was given. Appellant also pumped water from Big Whitewater Creek but Terry Bollinger admits he has no objection to that. Appellant's position is that he pumped water only from Big Whitewater Creek or from that part of the millrace located upon and crossing his land except on one occasion only when he asked for and obtained permission to pump from another place on the millrace. In any event, appellant does not now claim the right to pump water from any place in the millrace except where it crosses over what he claims to be his land. Although appellant pumped water from the millrace for five out of the previous seven years, neither E. S. nor Terry Bollinger objected to him doing so prior to the filing of this suit.

The trial court found that "plaintiffs" (which included Terry Bollinger who claims no ownership in the mill or millrace in any respect whatever but whose interest at most is that of a lessee), "have been in the absolute, open, notorious, adverse, continuous and exclusive possession and use of said mill and millrace * * *," and it "ordered and adjudged" that "plaintiffs"

are the fee simple owners of "such real estate and that title to same has been divested from defendant to plaintiffs * * * by limitation under the law of this state." There is no contention by appellant on this appeal that E. S. Bollinger and his wife do not have fee simple title to the mill and to all of the millrace except that small portion which crosses over land conveyed to appellant by Clyde Whaley who in turn received it from the Dolle family. The millrace is not described in the judgment of the trial court except as "a millrace water course about ten feet wide and of an average depth of one foot," which is "approximately one mile long," and "is located on land described in Exhibit 'A' attached to the original petition." Exhibit 'A' is a copy of the deed, executed on September 2, 1936 from the Dolle family to E. S. Bollinger and his wife. The trial court made no specific finding concerning the changing of the millrace with appellant's permission, and by reason of this and the reference to the land described in the 1936 deed, it would appear that it found that the millrace had not been changed to cross over land owned by appellant. However, other than the small portion of the millrace on appellant's land by reason of that change, there is no showing in the record that any part of the millrace has ever been on land from which the title could be divested from appellant by limitation.

Appellant contends that he is entitled to pump water from that part of the millrace which is on his land, an issue we need not decide unless the millrace is in fact on his land. Therefore, we shall first determine that question.

■ E. S. and Terry Bollinger contend that when the small portion of the millrace was changed it was not moved off the millrace strip of land as described in the deed from the Dolle family in 1936. We conclude that the evidence clearly establishes otherwise. Within a short time before the trial of this case the county surveyor, who was duly licensed as a surveyor and whose qualifications are not challenged, on two occasions surveyed the boundary line between the land of appellant and the millrace strip. The results of his surveys were shown on two maps or sketches, introduced in evidence as Defendant's Exhibits B and C, and both of these exhibits show that at the place where E. S. and Terry Bollinger requested permission from appellant to move the millrace to straighten out a sharp curve, the millrace is now located on and across land the record title of which was then and is now in appellant. The record also clearly establishes that at the time the change in the millrace was made E. S. and Terry Bollinger both knew it was being moved onto the land of appellant. Respondents admit in their brief that "the evidence was uncontroverted that permission to alter the race was asked of appellant," a request not needed and not even appropriate if the new location of the millrace was to be on the millrace strip. While digging the new channel the contractor unearthed a boundary marker consisting of a pipe set in concrete. After reporting this to Mr. Bollinger (apparently Terry Bollinger) in the presence of appellant, the contractor was told to go ahead and remove the boundary marker and construct the new channel for the millrace. We necessarily conclude that a portion of the channel of the millrace was moved by the Bollingers to straighten out a curve, and that it was knowingly placed on land then belonging to and in which the record title was in appellant, and that this change was made with the express permission of appellant.

■ Respondents contend that if a portion of the millrace was placed on appellant's land they now have title to that part of the millrace by adverse possession. We cannot agree. As a general rule permissive use or permissive possession of land cannot be adverse, Dalton v. Willis, 360 Mo. 329, 228 S.W.2d 709; Eld v. Ellis, Mo., 235 S.W.2d 273; Consolidated Dist. No. 4 of Jackson County v. Glandon, 363 Mo. 1, 247 S.W.2d 770; 3 Am.Jur.2d Adverse Possession § 36, and respondents state in their brief that "It is not disputed * * * that

permissive user falls short of adverse user." In view of our finding that a portion of the millrace was placed upon, and now is located upon and across land of appellant with his express permission, and in view of respondents' admission of the legal principle as to permissive user, we need not detail further the reasons for our conclusion that the trial court erred in holding that "plaintiffs" now have title by adverse possession to that portion of appellant's land over which the millrace is now located.

We turn now to the question of whether appellant may take any water from the millrace at the place where it crosses his land, and if so, to what extent. In the consideration of this issue a further statement of facts would be helpful.

The pool of water caused by the dam extends upstream about a quarter of a mile. Most of the time water flows over the top of the dam but in dry weather all the water is diverted into the millrace where it runs to the mill and through a tailrace back to Big Whitewater Creek. Terry Bollinger could not say how much water was needed to operate the mill. He stated that the millpond had not been cleaned since 1946 or 1950, that it was full of mud, and "the storage water on that millpond would last about five minutes running the mill if it was full." The precise amount of water taken from the millrace by appellant is not shown. He pumped water from the race only during a few days each year, when he pumped at all, and then not constantly. He pumped by use of a 4-inch flexible pipe and the pump would not operate in less than nine inches of water. Therefore, we find it difficult to accept Terry Bollinger's statement that appellant took "about half the water supply in dry time," but the testimony of appellant and his witness that the pumping reduced the level of the water only an inch or two and had very little effect on the height of the water in the millrace seems far more reasonable. Terry Bollinger was vague as to the effect of the pumping on the mill operation, and his testimony consisted primarily of conclusions rather than factual statements. In addition, when the mill is not operating, which is six out of every seven days, the water flowing through the millrace, which at times is the total flow of Big Whitewater Creek, is not used in any manner whatever in the mill operation.

 It appears from the record that at the location of the dam respondents E. S. Bollinger and his wife own but a small tract of land which includes the dam and a portion of the reservoir of water. While they may own the bed of the nonnavigable stream, Elder v. Delcour, 364 Mo. 835, 269 S.W.2d 17, 47 A.L.R.2d 370, they do not have exclusive title to the water flowing down Big Whitewater Creek even while it is on their land, and neither do they have complete freedom of use or control of the water. As stated in Elder v. Delcour, supra, at p. 24 of 269 S.W.2d, the owner of land through which a nonnavigable stream flows is "subject to the burdens imposed by the river," and is subject to certain limitations imposed in the public interest in the use of the water and the control of the land constituting the bed and banks of the stream. One such limitation, for example, is that such landowner cannot divert the water in a natural watercourse to the exclusion of others. Dardenne Realty Co. v. Abeken, 232 Mo.App. 945, 106 S.W.2d 966.

 Missouri is notable for the fact that it has almost no statutory law concerning rights of individual members of the public and of the public generally in public water and watercourses, and such cases as there are based on the common law usually arise from factual situations pertaining to the existence of too much rather than too little water. The millrace, when constructed, was an artificial watercourse, but as far as is shown by the record before us no part of it was on the land of appellant until the previously mentioned change was made in the course of the millrace. It may be that after more than 150 years the millrace has sufficient permanency to acquire the characteristics and incidents of a natural watercourse, see 56 Am.Jur. Waters § 151,

but we need not rule that issue. As a general rule riparian rights do not ordinarily attach to artificial streams in artificial channels. 56 Am.Jur. Waters § 155; Kinney on Irrigation and Water Rights, 2d Ed., § 473. However, there are variations of this general rule, and the variation we consider to be appropriate to this proceeding in which this court, sitting in equity, is to determine whether respondents are entitled to the exercise of the discretionary and extraordinary remedy of injunction, is stated in 56 Am.Jur., Waters § 155, as follows: "Where owners of different parcels of land conduct water across the same in an artificial channel, and do not define their respective interests in the water, their reciprocal rights thereto are to be measured and determined as if they were riparian owners upon a natural stream." This is the precise factual situation of this case.

The rights of a riparian owner in the water of a stream, in jurisdictions wherein the doctrine of riparian rights obtain, include "the right to the flow of the stream in its natural course and in its natural condition in respect of both volume and purity, except as affected by reasonable use by other proprietors, * * *," 56 Am. Jur. Waters § 273, and a reasonable use by other proprietors includes the "limited right to use the water to irrigate his riparian lands," 94 C.J.S. Waters § 314(1), subject to the priority of riparian owners for the supply of "natural wants" which include drinking water for family and for livestock. Kinney on Irrigation and Water Rights, 2d Ed., §§ 500–504. See also Farnham on Waters and Water Rights, § 599. What constitutes a reasonable use is a question of fact depending on the circumstances of each particular case, including, among other things, the volume of water in the stream, the seasons and climatic conditions, and the needs of other riparian proprietors. 94 C.J.S. Waters § 314(2); 56 Am.Jur. Waters § 342; Kinney on Irrigation and Water Rights, 2d Ed., §§ 490 and 495; Gould on Waters 3rd Ed., § 208.

We have established that appellant is entitled to the use for irrigation purposes of some water from the millrace at the place where it crosses his land, and respondents admit that on approximately six days out of every seven the water in the millrace flows unused past the mill except to provide drinking water for a few hogs running on the millrace property. We necessarily conclude that the trial court erroneously enjoined appellant from taking any water at any time from the millrace for any purpose whatever.

Respondents make an impassioned plea in their brief for the "preservation of our heritage" as typified by the mill, and asserts that this suit "was brought primarily * * to help preserve this portion of our heritage." The applicable common law doctrine of reasonable use of water by riparian owners affords an adequate basis to the trial court for the preservation of the mill if the litigants as reasonable men with the aid of enlightened counsel cannot amicably settle their differences.

Appellant asserts that the trial court erred in granting the injunction it did because the dam was constructed in violation of Chapter 236 RSMo 1959, V.A.M.S. We agree with the trial court that there is no merit to this contention, and in any event our ruling on the meritorious features of his appeal makes unnecessary any discussion of this as well as other issues presented in appellant's brief.

The judgment is reversed and the cause remanded for further proceedings according to the views expressed herein.

BARRETT, C., not sitting.

PRITCHARD, C., concurs.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.