**Wanda L. ROBERTS and Robert Carl Thomas and Viola Thomas, Appellants,**

v.

**O. Glen HOCKER and Mary V. Hocker and Tony B. Lumpkin and Elizabeth S. Lumpkin & Pearl Wallace Painter and Apartment Erectors, Inc., and Thomas H. Hocker and Elizabeth Hocker and The Commerce Trust Company, Trustee for Wilson D. Wood Mortgage Company and Connecticut Mutual Life Insurance Company of Hartford, Connecticut, Assignee of Wilson D. Wood Mortgage Company and Frank W. Koger, Trustee for James Talcott, a New York Corporation, Respondents.**

**No. KCD 30635.**

Missouri Court of Appeals, Western District.

Dec. 2, 1980.

322

James S. Cottingham, Campbell, Gilmore, Erickson, Cottingham, Morgan & Gibson, Independence, for appellants.

Morris J. Nunn, Mark E. Johnson, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, for Hocker, Lumpkin, Painter & Apartment Erectors.

John H. Foard, Sr., Smith, Foard & Perkins, Kansas City, for Hocker, Lumpkin, Painter, Apartment Erectors & Commerce Trust Co.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The appeal comes from a judgment adverse to a petition for damages and mandatory injunction on a claim that the defend-

ants unreasonably diverted surface water onto the land of the plaintiffs.

The contentions are as to contiguous tracts on a strip of land situated between Highway 40 to the north and I-70 to the south. The upper one-third of the land lies within the limits of Independence and the remainder two-thirds, within Kansas City. The land sited in Independence fronts on Highway 40 and is used for commercial purposes. The land sited in Kansas City fronts I-70 and is used for dwelling purposes. The plaintiffs Thomas purchased the western tract in 1946 and in 1968 built two residences on the lower area. [The plaintiff Roberts, a Thomas daughter, occupies one of the structures.] A ceramics factory constructed in 1965 occupies the upper area. The HPL Development Company purchased the eastern tract in 1959. HPL was dissolved in 1965 and the shareholders [defendants here] became the fee owners as partners. The fee was thereafter leased to the defendant Apartment Erectors, Inc. with an option to purchase. Apartment Erectors then completed an apartment complex on the lower area of the eastern tract in May of 1967. The upper area of the tract was sold to V's Restaurant in 1971 and a dinner-lounge was installed on the site.

The mass of land was drained by a latticework of streambeds. In the natural state, the flow of the surface water was to the southwest through three tributaries on the land of the defendants [D tract]. These outlets—and a fourth creek to the west from the land of the plaintiffs [P tract]—converged into a single stream which originated on the D tract and moved southwest across the property line onto the lower P tract. The raw D tract was rough and hilly terrain and inclined into a hollow which contained the bed of the main stream. [That is to say, the P tract was lower than the D tract.] To prepare the D tract for apartment construction development, in 1963 HPL reduced a hill and terraced the property. In that course, the three natural drainway tributaries on the D tract were levelled, tubes installed to carry off the

water flow, and the area covered over. The tributaries were fed by the natural waterfall from the north side of Highway 40 and from the runoff on the tracts. The two easternmost feeder streams on the D tract were drained and a culvert installed parallel to Highway 40 to capture the natural flow usually fed into those tributaries. The westernmost tributary was made straight and a 72″ tube installed along that bed. The water from the diversion of the two other tributaries was fed by the culvert into the 72″ tube and carried off by the main stream. HPL laid another [36″] tube parallel to the property line. The purpose of that improvement was to carry off the surface water from both the P and D tracts and to drain the efflux from a 27″ tube the *plaintiffs* installed earlier [apparently along the bed of the fourth tributary]. That water from the P tract was emitted into a hollow on the D tract property line for eventual discharge into the main stream. The upper terminal of the 36″ tube was placed near the exit of the 27″ tube to receive the effluence from the P tract tube and to facilitate the transport of the water into the main stream. A grate aperture in the 36″ tube drained the surface water from both the P and D tracts. The 72″ and 36″ tubes were so placed that the lower terminals expelled water into the same point of the main stream. The tubes on the D tract [as was the tube earlier on the P tract] were covered and eventually laid over with asphalt.[1] The work on the D tract was completed in middle 1967 and the apartments opened for occupancy. The surface of the parking area was laid with asphalt. The automobile area for V's Restaurant, then no longer owned by defendants, was later surfaced with asphalt also.

The evidence agrees that the site grades and tube installations did not affect the direction of the flow of drainage. The evidence agrees also that the water flow since the improvements does not exceed the capacity of the natural channel of the stream. There was evidence, however, that the overlay of asphalt upon otherwise porous

1. See Appendix.

ground increased the volume of surface water for drainage. There was evidence also that the transport through tubes rather than by open drain increased the velocity of the water. The plaintiffs contend that the tubes are so located[2] that they spill with increased velocity against the west bank of the stream so as to accelerate erosion and undermine the land. The plaintiff Thomas testified that at the point of emission, the 72″ tube was at a right angle to the channel—and only some 20 feet from the Thomas residence. He described a course of erosion which moved relentlessly towards the Thomas' house and which has lowered the stream bed some four feet. The plaintiff engineer expert attributed the bank wash and deepened channel to the placement of the tubes and the turbulence of the discharge caused by the increased water velocity. The defendant engineer expert, on the other hand, detected a stream bed deepened only one or two feet beneath the level of the tube placement after fifteen years of water spill, and a bank erosion of no more than four feet at that site. The attrition of the west bank, he gave as opinion, was largely due to the natural meanders of the open water. The experts agreed, in any event, that the deepened stream bed was at the site of the tubes, and thus was an effect mostly on the D tract. The plaintiff testified also that the exposed roots of trees on the west bank of the stream proved the erosive force of the water emitted from tubes. The defendant expert, however, gave evidence that the trees were in that state for at least thirteen years before. There was other contested evidence on the issue whether the erosion of the stream bank was a natural or induced effect.

The engineer for the plaintiffs proposed as the solution to abate the erosion process of the stream bed and banks the installation of a concrete construction in the form of a box, 8 inches thick, 25 feet long and 12 feet wide at exit. The purpose of the design was to absorb the turbulence of the emitted water and so reduce the effect of erosion. The cost of correction was estimated at $3300.

The plaintiffs assert damage from another, separate, diversion of the surface water by the defendants. They contend that the apartment complex terrain was so elevated and the appurtenant parking lot so constructed that the surface water concentrated at a low point and then gushed onto the lower P tract to drain into the stream. The result, the plaintiffs contend, is a deep gully worn across the P tract on the way to the stream, and an erosion of the stream where the gully enters. The plaintiff Thomas testified that the site preparation raised the elevation on the land for the apartment complex by six feet, and so affected the natural flow of the surface water into the stream. The defendants gave evidence that the apartment structures and lot conformed to the natural terrain but for slight modification. The parking area was so constructed that the lot pitched to a low point. The lot was rimmed by a curb along the west edge with an aperture at the low place to allow the surface water to flow off and drain into the stream. The plaintiffs contend that the curb construction had the effect of a spigot, so that the water fell in concentrated volume rather than as an even sheet flow over the P tract as when the D tract was in original condition. The result, the plaintiffs contend, is an erosion gully across the P tract to the stream. The evidence of the defendants shows, rather, that the lot followed the natural contour of the land, so that the drainage before construction—as afterwards—was from the low point and by an even sheet flow. That

---

2. The 36″ tube virtually abutted the P tract. The 72″ tube outlet was adjacent, some five feet east of the P tract [see Appendix]. There was testimony by the plaintiff Thomas that the 1963 site grade work in preparation to development of the D tract [the reduction of a prominence on the southeastern D tract for use as fill for the hollow on the northwestern D tract] along Highway 40 somehow altered the channel of the stream some 30 or 40 feet to the west. The expert engineer for the defendants, who designed the drainage system of developer HPL in 1963, testified that the course of the stream channel widened some four feet within the fifteen years since the site preparation and tube installations. The findings and judgment give no effect to this contention of evidence by the plaintiffs.

evidence was that the gully was the result of the natural drainage from the D tract into the creek on the P tract and was formed even before the construction on D tract. The erosion of the gully began to work towards the D tract, so that after installation of the parking lot, the defendants scattered concrete rubble at the edge of the lot [and, apparently, over some of the P tract as well] to protect against that encroachment.

The solution suggested by the engineer witness for the plaintiffs was a catch basin at the low point of the lot connected to the stream by a culvert to capture the efflux of water from the lot by a drop into the tube and discharge into the stream. Thus, the correction involves installation over both the P tract and D tract. The estimated cost was given as $4,000.

There was evidence that the erosion of the stream bed and bank on the P tract from the tubes' emission was evident to the plaintiffs Thomas as early as 1968. There was evidence also that they were aware even then that the gully across their land to the stream was an erosion from the drainage of the surface water from the D tract parking lot. Thus, when the Thomases constructed the two residences on P tract in 1968 they knew that the attritions of their land from the water flow from the elevated D tract [by their description] had begun and would continue.

The entry of judgment for the defendant rests on determinations of fact and conclusions of law [as to the damage contended from the tube installations] that: the natural contours of terrain drained the surface water from the D tract through three tributaries into a stream—still on D tract—which meandered southwesterly across the P tract; the two tube culverts emitted water into the same natural stream channel; the effluence, although more concentrated after the tube installation, did not exceed the natural capacity of the natural drainway; any erosion of the P tract beyond the terminus of the tubes was within the natural bounds of the stream; any erosion of the west bank and stream bed was from the natural meander and flow of the water; the system of storm sewers was a lawful means for the defendants to rid the D tract of surface water and was accomplished without negligence or other liability.

The entry of judgment as to the damage contended from the construction of the apartment structures and parking lot rests on determinations of fact and conclusions of law that: the construction was on the natural contour of the D tract so that the low point on the parking area by which the water drained from that tract was the same as before the improvement; the flux of water from the low point to the creek on the P tract describes a natural surface drainway; the water from the driveway does not exceed the natural capacity of the drainway; the construction of the lot was to continue the flow of the water into the existent stream; the gully which conducts the water through the D tract to the stream is the same location for the flow of drainage prior to the construction; any erosion from the emission of that water began at the completion of the parking lot and was known to the plaintiffs by 1968 at the time of the residence constructions on the P tract; the apartment buildings and parking lot developments were reasonable uses by the defendants of the tract and, in that use, they were entitled to rid the surface water into an existent natural channel; the construction of the improvements was without negligence or other liability.

The judgment rested on another determination: that the erosion damage [both from the tube culverts and parking lot] were known to the plaintiffs since year 1968, that they were caused by permanent structures, that the action of the plaintiffs commenced on March 26, 1975, and thus the petition was barred by the five-year period of limitations of § 516.120.

The plaintiffs attribute errors to the judgment, among them that the trial court misapplied the common enemy doctrine—the usual rule of liability as to the deflection of surface water—to the diversion of a natural watercourse. The contention distinguishes between the three tributaries on

the D tract as natural drainways and the stream into which they conjoin to flow from the D tract into the P tract as a watercourse. This distinction allows the plaintiffs to argue that the diversion of the stream by the erosion of the banks and deepened channel was actionable as an obstruction of a watercourse, however carefully devised, rather than excusable as a reasonable defense against the surface water common enemy.[3] *Happy v. Kenton,* 362 Mo. 1156, 247 S.W.2d 698, 700[1] (1952). This rationale, however valid as a statement of principle, does not present an issue. That argument as an element of litigation confronts a court for the first time on appeal. The pleadings and evidence describe a theory of recovery for the diversion of *surface water* and not for the infraction of riparian right. The litigants engaged on that theory and the court gave judgment on that theory. The party on appeal will be held to the same hypothesis on which the case was tried. *Kestner v. Jakobe,* 446 S.W.2d 188, 196[9–11] (Mo.App.1969).

■ The distinction between a *watercourse* and *surface water* is more than the vagary of language the plaintiffs suppose. The law distinguishes them by separate definitions and separate consequences:

> A watercourse is a living stream of water with well defined banks, and a channel and bed. Such a stream to be a watercourse need not run continuously, *but it must be fed from other and more permanent sources than mere surface water* .... [*Scott v. Missouri Southern R. Co.,* 158 Mo.App. 625, 139 S.W. 259, 261 (1911); *Anderson v. City of Jefferson,* 262 S.W.2d 169, 171[1] (Mo.App.1953)]. [emphasis added]

A watercourse gives rise to riparian rights. *Happy v. Kenton, supra,* l.c. 701.

[Surface water encompasses also] water flowing in the hollows or ravines in land ... from rain or melting snow ... discharged through them from a higher to a lower level, but which at other times are destitute of water. [*Benson v. The Chicago & Alton Railroad Company,* 78 Mo. 504, 514 (1883)]. [Yet, surface water] need not have banks or a bed; the contour of the topographical features of the land itself constitute the "channel" within which the surface water flow is contained. *Borgmann v. Florissant Development Company,* 515 S.W.2d 189, 195[4] (Mo.App.1974).[4]

[S]urface waters are the uncollected flow from falling rain or melting snow, or are waters which rise in the earth from springs and diffuse over the surface of the earth. [Clark, Waters and Water Rights, § 52.1(A) (1967)].

The land affected by surface water may divert the diffusion to protect against the flow of the water as a common enemy.

■ The common enemy doctrine enables a landowner to repel surface water from the estate by discharge of the flow upon the land of a coterminous owner. The early rigid rule was an unrestricted right to fend off the surface water by whatever means and without account for consequences. *Haferkamp v. City of Rock Hill,* 316 S.W.2d 620, 624[4] (Mo.1958). The rule as tempered still regards surface water as a common enemy, but allows diversion by the landowner only upon an exercise of due care and prudence. *Abbott v. K. C. St. J. & C. B. Ry. Co.,* 83 Mo. 271, 283 (1884); *Miller Land Company v. Liberty Township,* 510 S.W.2d 473, 475[3, 4] (Mo. banc 1974). The rule of reasonable conduct prevents a landowner from impoundment of surface waters

---

**3.** The argument lacks precision. In one phase, the plaintiffs describe the waterways as "three natural drainageways [and] the one natural watercourse" and, in another phase, they contend that the 72" tube installed in the bed of one of the "three drainageways" constituted a diversion of a "natural watercourse" so that the action was not protected by the common enemy doctrine applicable to surface water.

**4.** In addition to the consensus of the litigants as to the theory of the cause of action asserted by the petition, there was no evidence that the water conducted by the tributaries or stream was from any other source than rainfall or other such diffusion—that is, other than surface water. These authorities show that the incidence of a channel for the surface water, merely, does not establish a watercourse.

into an artificial channel for discharge in a concentrated body on the land of another. *Blydenburgh v. Amelung*, 309 S.W.2d 150, 152[1] (Mo.App. 1958). The reasonable use and development of land, however, allows an owner to use artificial water channels to carry off surface water in concentrated flow *provided* the discharge emits into a " 'natural surface-water channel' located on his property" even though the method of riddance accelerates and increases the flow of surface water, *provided further* that the owner acts without negligence and does not exceed the natural capacity of the natural drainway to the damage of the neighbor. *Haferkamp v. City of Rock Hill*, supra, l.c. 625; *Borgmann v. Florissant Development Company*, supra, l.c. 195[4]; also, *Wells v. State Highway Commission*, 503 S.W.2d 689, 691 (Mo.1973).

■ The determinations of fact by the trial court rest on substantial evidence and validly invoke the conclusions of law upon which judgment rests. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. bank 1976). The determinations that the surface water was drained from the D tract through the artificial tubes into the stream, a natural surface-water channel [still on the D tract], that the diversion was without negligence, and although the flow onto the P tract increased and accelerated the emission did not exceed the natural capacity of the stream—all conclude that aspect of the petition against the plaintiffs. *Haferkamp v. City of Rock Hill*, supra, l.c. 625, 627; *Borgmann v. Florissant Development Company*, supra l.c. 195[4]. The determinations that

the stream bank erosion was not induced but a natural consequence of meander and water movement, and that the deepened stream bed was on the D tract, was evidence merely cumulative to the judgment.

The determinations that the contour of the parking lot and apartment construction conformed to an existent topography and drainage, so that the surface water flow emitted from an existent low point into an existent natural surface water stream channel—albeit by an increased and more concentrated emission but within the capacity of the stream—and that such conduct was with due care, also rest on substantial evidence and conclude that aspect of the petition against the plaintiffs. *Skaggs v. City of Cape Girardeau*, 472 S.W.2d 870, 873[1–3] (Mo.App.1971); *Haferkamp v. City of Rock Hill*, supra, l.c. 625, 627.

■ The judgment determines that the evidence does not prove a cause of action. We do not confront, therefore, the validity of the conclusion of law that the cause of action was barred under § 516.120 because the damages accrued to the plaintiffs more than five years before commencement of suit. Nor do we confront whether the source of injury [the tube installations and parking lot constructions] are permanent—and so a single accrual—or abatable—and so each accrual anew—for purposes of limitations. See, *Rebel v. Big Tarkio Drainage District*, 602 S.W.2d 787, 793[18–20] (Mo. App.1980); *Webb v. Union Electric Co. of Missouri*, 240 Mo.App. 1101, 223 S.W.2d 13, 19 (1949).[5] Nor, finally, do we confront

---

5. The appellants urge that we pursue the trend to unify the different classes of water into one standard of use—reasonable use—already applicable to define riparian rights to watercourses [*Bollinger v. Henry*, 375 S.W.2d 161 (Mo. 1964)] to subterranean streams [*Springfield Waterworks Co. v Jenkins*, 62 Mo.App. 74 (1895)] and to underground percolating waters [*Higday v. Nickolaus*, 469 S.W.2d 859 (Mo.App. 1971)] to include surface water. These waters —watercourses, subterranean streams and underground percolations—are a resource of beneficial use to abutting and overlying landowners and are the object of their competition. The developed law treats them as a generic class and employs the rule of reasonable use as

a means to ensure a fair distribution of that essential, but limited, resource, *Higday v. Nickolaus*, 469 S.W.2d 859, 869 (Mo.App.1971); *Bollinger v. Henry*, supra, l.c. 166[9, 10]; 1 Clark, Waters and Water Rights §§ 2.1–2.5 (1967); Lauer, *Reflections on Riparianism*, 35 Mo.L.Rev. 1 (1970). The competition as to surface water, however, goes to the *riddance* of the water, not the *use*. Hence, the *common enemy* terminology. 1 Clark, Waters and Water Rights, § 52 (1967). The law of surface water is an incident of the enjoyment and development of land and not of the beneficial use of water. As our decisions show, our law of surface water in fact tends to a rule of reasonable use—however umbrous the bounds—to

whether the evidence even found conformably to the plaintiffs allows a role for the extraordinary relief of mandatory injunction the plaintiffs assert on appeal. *Minton*

take into account the rights of each landowner to the fair enjoyment of the land, at least to the extent that the surface water shall not be deployed negligently onto the land of the other. *Wells v. State Highway Commission*, 503 S.W.2d 689 (Mo.1976); *Miller Land Co. v. Liberty Township*, 510 S.W.2d 473 (Mo. banc 1974). That rule of due care, as our decision shows, applies not only to a case of diversion by concentration of the flow, simply, onto the usual drainage over the adjacent lot [the parking lot construction], but also to the collection and discharge of surface water onto the land of the other [the tube installations]. *Borgmann v. Florissant Development Company*, 515 S.W.2d 189 (Mo.App.1974); *Skaggs v. City of Cape Girardeau*, 472 S.W.2d 870 (Mo.App.1971); *Haferkamp v. City of Rock Hill*, 316 S.W.2d 620 (Mo.1958). We may well agree that the reality of modern urban life requires that an even more considerate rule of reason apply so that the basis of liability [at least as to urban areas] becomes whether the benefit of the improvement to one land outweighs the harm resultant to the other. Bridges, *The Application of Sur-*

*v. Steakley*, 466 S.W.2d 441, 443 (Mo.App. 1971).

The judgment is affirmed.

All concur.

*face Water Rules in Urban Areas*, 42 Mo.L.Rev. 76 (1977); Annot., *Drainage of Surface Waters—Interference*, 93 A.L.R.3d 1193, § 7 (1979). Once again, issue was not presented to the trial court on that theory, nor does the brief for appellants—which raises the general notion for the first time—raise the essential question of law. In sum, the law of surface water deals with the beneficial use of land, and not water, and so does not fall functionally within rules of reasonable use of watercourses and other waters of that genre. Finally, the tempered common enemy rule—and the incidents of reasonable use of surface water since developed—has been the law of Missouri from pronouncement in *Abbott v. The Kansas City, St. J. and C. B. Ry. Co.*, 83 Mo. 271 in the year 1884. We are bound by that rule of decision and the record before us allows no basis for transfer to the Supreme Court for consideration of that question of general interest and importance. Mo.Const. Art. V, § 2 (1945); Mo.Const. Art. V, § 10 (1945) (as amended at special elections August 3, 1976).