**Dennis D. HANSEN, et al., Plaintiffs–Respondents,**

v.

**GARY NAUGLE CONSTRUCTION COMPANY, Defendant–Appellant.**

No. 72631.

Supreme Court of Missouri, En Banc.

Dec. 18, 1990.

Cullen Cline, Elizabeth E. Parrigin, Columbia, for defendant-appellant.

Ronald H. Bartlett, Columbia, for plaintiffs-respondents.

ROBERTSON, Judge.

Plaintiffs Dennis and Deborah Hansen and Morey and Wan–Tsih Chao brought

suit against defendant, Gary Naugle Construction Company (Naugle), for damages allegedly sustained as a result of an increase in the volume and velocity of surface water runoff following Naugle's development of land lying uphill from plaintiffs' property. The trial court, without a jury, found Naugle liable for trespass and/or nuisance and awarded the Hansens and the Chaos $5,800 each in damages. The Court of Appeals, Western District, reversed. We granted transfer to consider the applicability of Missouri's modified common enemy doctrine to actions against land developers founded on nuisance and trespass. We have jurisdiction. Mo.Const. art. V, sec. 10. Reversed and remanded with directions to enter judgment for defendant.

## I.

Because plaintiffs received a favorable verdict, we take plaintiffs' evidence as true, giving plaintiffs the benefit of all favorable inferences arising from that evidence. *T.G.B. v. C.A.G.*, 772 S.W.2d 653 (Mo. banc 1989).

Prior to any development, all of the land at issue in this case belonged to Fred Coats, who operated a cattle farm on it. Coats testified that the land the developer purchased from him upon which plaintiffs' homes were constructed was part of a natural drainway. That developer filled the area with approximately eight feet of dirt and constructed the plaintiffs' homes on that fill. Indeed plaintiffs' First Amended Petition avers, among other things, that plaintiffs' damages "are the direct and proximate result of the conduct of Defendants in ... the channeling of surface waters [from Defendants' property] onto the natural drainage area."

The Chaos and the Hansens own houses on adjoining land on a cul-de-sac; the cul-de-sac is located near Merideth Branch, a creek that drains into Perche Creek and eventually into the Missouri River. Each purchased their property prior to Naugle initiating development on its property.

In 1981, Naugle purchased a 25-acre tract uphill from the plaintiffs' property. At the time of its purchase, Naugle's property consisted mostly of pasture land with some timber. Two natural ravines drained a large part of the Naugle acreage. These ravines, which remained dry except during times of rain or snow melt, originated east of the plaintiffs' properties and converged into a single ravine at a point approximately 300 feet east of the Chao property. After a moderately heavy rain, surface water flowed down the ravines, converged, and entered the Chao property, flowing across the Chao front lawn in a depression, or swale, the contour of which is built into the driveway and which was apparently fashioned by the builder of the Chao house to direct the flow of runoff. From the Chao property, the runoff continues through the swale across the Hansen property and into Merideth Branch.

In 1985, Naugle began developing 18 of the 25 acres. The development activities included improvement of the land by excavating, grading, removing surface vegetation, laying sanitary sewers, paving streets and constructing houses. Naugle also constructed four catch basins in the paved streets of the subdivision. Surface water collected by the catch basins emptied into the ravine through a 30-inch pipe. In addition, Naugle constructed two detention ponds on its property, designed to decrease the velocity of the flow of the surface water through the ravine. The larger of the two ponds was built at the point where the two smaller ravines converged. There, Naugle sculpted a berm, or small dam, intended to pool the water for release in a controlled flow through four 8-inch pipes at the base of the berm. Although defendants strongly disputed the evidence, plaintiffs' experts testified, the trial court found, and we take as true, that Naugle's development activities resulted in the velocity and volume of storm water runoff increasing by three times from that which was normally discharged over plaintiffs' land by virtue of the natural drainway patterns of Naugle's undeveloped land. The trial court also found that Naugle's collection and discharge of surface water occurred in such destructive and increased

quantities as to constitute a trespass, or in the alternative, that Naugles' use of its land was unreasonable and created a nuisance resulting in damages to the plaintiffs.

## II.

■ "The judgment of the trial court will be sustained ... unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

### A.

■ The law considers surface water runoff a "common enemy" of all property owners. *Haferkamp v. City of Rockhill*, 316 S.W.2d 620 (Mo.1958), extensively tracks the evolution of the common enemy doctrine. We need not repeat that history here. It is sufficient for our purposes to note that in its original form, the common enemy doctrine permitted a property owner, as an incident to his right to use his own property, to fend off surface waters without consideration for the consequences to other landowners. *Id.* at 625. Many courts have found the rule too harsh and modified it somewhat. Thus, *Haferkamp*, which adopted a modified common enemy doctrine for use in Missouri, protects the owner of an upper tenement from liability to lower landowners for surface water runoff provided that (1) the discharge flows into a "natural drainway channel" located on his property "where the surface water from the drained areas would naturally go ... even though in doing so they [the upper landowner] might increase and accelerate the flow of surface water in its natural channel onto the lands of the plaintiff," *id.* at 627, and (2) the upper owner "acts without negligence and does not exceed the natural capacity of the natural drainway to the damage of the neighbor." *Roberts v. Hocker*, 610 S.W.2d 321, 327 (Mo.App. 1980), *citing Haferkamp.*

### B.

The trial court's judgment in this case is founded alternatively on trespass and nuisance. Trespass and nuisance are among the recognized exceptions to the common enemy doctrine. *Hawkins v. Burlington Northern, Inc.*, 514 S.W.2d 593, 600 (Mo. banc 1974).

■ A trespass is a "direct physical interference with the person or property of another." *Mawson v. Vess Beverage Co.*, 173 S.W.2d 606, 613 (Mo.App.1943). "The essence of the action is wrongful entry. Trespass has its origin in an intentional act, even though the actor may not intend to invade the property of another." *Looney v. Hindman*, 649 S.W.2d 207, 212 (Mo. banc 1983). *Looney* seems to say that a trespass action will lie only where the defendant undertakes some alteration of the natural drainage patterns for the purpose of altering those patterns. *Id.* 212–13. In the presence of that sort of proof, the " 'unauthorized entry' or 'invasion' or 'disturbance of possession' which is characteristic of trespass cases" is present and the owner of the upper tenement is liable for damages. *Id.*

■ Nuisance, on the other hand, is founded on an unreasonable, unusual or unnatural land use that substantially impairs the right of the owners of the lower tenement to enjoy their property peacefully. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 880 (Mo. banc 1985). *Frank* notes that "[n]uisance is an effect rather than a cause of tort liability and conduct antecedent to the interference may be irrelevant." *Id.*

### C.

■ The dispositive question in this case is whether the unauthorized entry which is the hallmark of a trespass case, *Looney*, or the unreasonable land use which is the crux of nuisance, *Frank*, are present when a developer collects surface water on his own property and discharges it through and within the capacity of the natural drainway onto a lower tenement. The common enemy doctrine as applied in Missouri dictates: first, there can be no trespass

when the owner of the upper tenement discharges water "where it would have gone anyway." *Haferkamp,* 316 S.W.2d at 627. Second, it is not an unreasonable use of an upper tenement—and thus not a nuisance—to undertake development of higher land unless the effect of such development becomes unreasonable because the upper landowner discharges water outside the natural drainway or discharges surface water onto the natural drainway in excess of the capacity of that drainway. *Haferkamp,* 316 S.W.2d at 626; *Roberts,* 610 S.W.2d at 327. Said another way, unless the plaintiff can show that the defendant has diverted the flow of surface water runoff out of its natural drainway or caused the accumulation of surface water runoff in such a way as to permit its discharge to exceed the capacity of the natural drainway, the common enemy doctrine defeats plaintiff's cause of action in trespass and nuisance for damages caused by surface water runoff.

### D.

We turn now to the findings of fact entered by the trial court in this case to determine whether the trial court found such facts as to bring Naugle's alteration of the upper tenement within an exception to the common enemy doctrine as modified in Missouri.

The trial court found that Naugle altered the natural drainage patterns of the surface water on Naugle's land. This, of course, is assumed whenever a developer alters rough land by the grading, excavating and the construction of residences and the installation of streets and sewage systems. The trial court did not find, however, that the discharge from the Naugle property to the plaintiffs' property was outside the natural drainway. Indeed, the trial court found that the storm water runoff "increased three (3) times from that which was normally discharged over plaintiffs' land by virtue of the natural drainage patterns of defendant's undeveloped land." Inherent in this finding is the assumption, supported by the record, that prior to development surface water drained from Naugle's land across the plaintiffs' land

naturally. The trial court did find that Naugle collected surface water and discharged it in destructive and increased quantities, but did not find that the discharge from the Naugle property exceeded the capacity of the natural drainway. Nor do we find any language in the trial court's findings of fact from which it can be reasonably inferred that the discharge exceeded that capacity.

■ The error of the trial court's judgment is twofold: first, the trial court assumed that the alteration of the natural drainway on Naugle's land is the critical element. It is not. Instead, under the facts of this case, both the nuisance and trespass action depend on a finding that the defendant discharges water outside the natural drainway on the plaintiff's property. Second, the trial court apparently believed that the plaintiffs proved their case by showing that Naugle's activities increased the volume and velocity of surface water runoff across their property and that damages followed. That judgment is incorrect. The law is quite clear in Missouri; we see no need to alter it. For the sake of clarity we repeat the rule. A developer may "collect surface water [on its property] in artificial drains and precipitate it into a natural drainway channel thereon ... even though in doing so they might increase and accelerate the flow of the surface water in its natural channel onto the lands of the plaintiffs." *Haferkamp,* 316 S.W.2d at 627.

■ There being no finding by the trial court that Naugle's development activities either discharged water outside the natural drainway onto the plaintiffs' land or that the development activities resulted in a discharge of surface water runoff such as would exceed the capacity of the natural drainway, plaintiffs have failed to prove any right to recovery under either trespass or nuisance.

### III.

The judgment of the trial court is reversed and the cause remanded for entry of a judgment in favor of defendant.

BLACKMAR, C.J., HOLSTEIN, J., and CRANE, Special Judge, concur.

HIGGINS, J., dissents in separate opinion filed.

RENDLEN and BILLINGS, JJ., dissent and concur in dissenting opinion of HIGGINS, J.

COVINGTON, J., not sitting.

HIGGINS, Judge, dissenting.

The majority, although recognizing that because plaintiffs received a favorable verdict this Court must take plaintiffs' evidence as true and give plaintiffs the benefit of all favorable inferences arising from the evidence, nevertheless reverses the trial court's judgment without full consideration of all such evidence in this case. The majority instead, erroneously focuses on the absence of a "finding by the trial court that [defendant's] development activities ... resulted in a discharge of surface water runoff such as would exceed the capacity of the natural drainway."

Such focus and its result give short shrift to Rule 73.01 governing review of court-tried cases and the rule of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Their application and effect were recently enunciated by this Court in *Lightner v. Farmers Insurance Company, Inc.*, 789 S.W.2d 487 (Mo. banc 1990):

> Our standard of review on this court-tried issue is governed by the teachings of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment will be sustained unless there is no substantial evidence to support it or it is against the weight of the evidence; seldom should a judgment be set aside on the ground that it is against the weight of the evidence, and then only with caution and a firm belief that it is wrong. On the record here, we cannot say there is no substantial evidence to support the judgment.

*Id.* at 489. The majority demonstrates sufficient evidence to support the trial court's judgment, yet the majority fails to heed and apply the rules. Contrary to the teachings of *Murphy*, the majority substitutes its judgment for that of the trial court. Because substantial evidence of defendant's causing the water to exceed the capacity of the plaintiffs' natural drainway

exists in this case, and because Rule 73.-01(a)(2) renders the trial court's lack of such a finding of no import ("All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached."), the trial court's judgment for plaintiffs should be affirmed.

Evidence in addition to that recited by the majority is available: Three of the plaintiffs testified that prior to defendant's development activities the "natural drainway" that crossed their yards was a small, shallow ditch. Plaintiff Dennis Hansen stated that, prior to defendant's development, this ditch had "fairly gradual sides to it," it had "[n]o steep sides to it," it "fairly conformed to the swale that was in the driveway," it was "[f]our inches, five inches" deep, and that, after defendant's development, the ditch is "12 to 15 inches deep" with "fairly steep sided" banks that are "more" steep sided than when he first moved into his home in 1984. Plaintiff Morey Chao testified that, prior to defendant's development, a heavy rain caused runoff water to cross his yard in a stream "two or three foot wide and about [a] couple inches deep," and that after a light rain he "hardly could see the water" crossing his yard. Plaintiff Debbie Hansen stated that the most water she had ever observed cross her property in the ditch, prior to defendant's development, was a stream "six inches wide and less than an inch deep," that since defendant built his berm and detention basin "[t]here is more water now than at the time the berm was constructed," and that no runoff water ever stood in her yard before defendant began construction.

Plaintiffs' testimony showed and described the increased water flow caused by defendant's development, which not only deepened and widened the ditch but caused the ditch to flood. Plaintiffs' photographic exhibits graphically depict the flooded ditch that caused the runoff water to inundate their front yards and driveways. Plaintiffs' expert, Carl Niewoehner, a registered professional engineer, used a "rationale formula" and calculated "an increase of at

least 297 percent of water" flowing across the plaintiffs' front yards, caused by defendant's development. Niewoehner testified that such a water flow through the plaintiffs' ditch "could be excessive and destructive" and that defendant's attempt to keep the water flow at the same level as it was prior to his activities (by using a "detention basin" on his land) was "not working." The trial court's finding that the runoff water from defendant's development was excessive and destructive is supported by the judge's statement in the transcript that the question of whether the water was excessive or destructive had "been asked and answered" because Niewoehner "indicated it was his opinion it was excessive and it could be excessive and destructive."

Further evidentiary support for the trial court's decision is found in plaintiffs' testimony that prior to defendant's construction no runoff water ever exceeded the ditch's capacity or inundated their front yards or driveways. Plaintiff Dennis Hansen asserted that he did not "see any evidence of any water damage to [his] property ... before [he] bought it," and that the difference in his front yard between May 1984 (when he moved in) and May 1985 (after defendant began his development) was that "[t]here ha[d] been erosion, siltation." Plaintiff Morey Chao testified that he had "never" seen the conditions depicted in plaintiffs' photographic exhibits (showing plaintiffs' front yards and driveways inundated with runoff water after defendant's development began) prior to defendant's development, that he had never had "any problem not being able to play basketball" in his driveway prior to defendant's development, and that since defendant began developing he "[has] trouble getting to [his] mailbox" after a rain, his sons have trouble getting "into the house," his wife has trouble backing her car out of the driveway (the water is "between one and one and a half foot deep"), and his car's brakes do not function after driving through the flooded driveway ("it takes about two or three miles driving to town and then the brake will start work again"). Chao also testified that before defendant began developing, water did not "ever col-

lect or pool on [his] driveway" and that with regard to any water running across his yard before defendant began its development, it was "[n]ot much" and "[n]ot as much as now." Plaintiff Debbie Hansen stated that she had never "observed any water in [her] yard or in Mr. Chao's yard such as is depicted in" plaintiffs' photographic exhibits, that the post-rain water that now stands in her front yard and driveway causes problems "because the water stands in [her] yard now after it rains and [her child] can't go outside because it's too deep," that no runoff water "ever stood in her yard before construction began," and that the water that stood in her yard prior to defendant's construction was "water ... backed up ... from the Merideth branch." The credibility of all witnesses was for the trial court to judge. Rule 73.01(c)(2).

Thus, substantial evidence and all favorable inferences to be drawn from the evidence in this case support the trial court's decision even though the witnesses did not use and the judge did not make a specific finding that used the magic words "exceed the capacity of the natural drainway." When the photographic exhibits of plaintiffs' flooded yards and driveways were entered into evidence, the trial judge had an abundance of evidence showing that the runoff from defendant's development exceeded the capacity of plaintiffs' natural drainway. Under *Murphy* and Rule 73.01, this Court's duty is simply to review the evidence to see if its substance supports the trial court's decision and, if so, to affirm that decision. The majority evades that duty and substitutes its own interpretation and application of the evidence for that made by the trial court. Under the mandated review, the record demonstrates that the plaintiffs made a submissible case, *see Looney v. Hindman*, 649 S.W.2d 207, 210–11 (Mo. banc 1983), and that the trial court's judgment thereon is supported by substantial evidence. The judgment for plaintiffs should be affirmed.